STATE OF NORTH CAROLINA v. MOLLIE HICKS

No. 745SC334

(Filed 7 August 1974)

**Criminal Law § 11; Homicide § 21— accessory after fact to involuntary manslaughter — sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of accessory after the fact of involuntary manslaughter where it tended to show that the principal felon told defendant that he had shot decedent while "playing" with a shotgun in defendant's apartment, that defendant successfully encouraged the principal and others who were in the apartment at the time of the shooting to tell investigating officers that deceased was shot by someone from outside when he opened the door, that defendant published such false story to others, and that when questioned by officers defendant concealed her knowledge that the principal had killed decedent and told officers she had heard a rumor that a white man had been seen running from the apartment.

ON *certiorari* to review trial before *Rouse, Judge,* at the 18 June 1973 Session of Superior Court held in NEW HANOVER County.

Defendant was indicted for being an accessory after the fact to involuntary manslaughter.

Evidence for the State tended to show the following. Early in the evening on 13 March 1971, Clifton Eugene Wright was fatally shot by Donald Jerome Nixon while Nixon was "playing" with a shotgun in defendant's apartment. Nixon had been staying in the apartment with defendant, her daughter and another youth. Nixon stated he did not know the gun was loaded but admitted that he intentionally pointed it at deceased and that he intentionally pulled the trigger.

Defendant's daughter, Leatrice Hicks, was at the apartment when the incident occurred and immediately telephoned defendant who was at a meeting. Shortly after the police arrived, defendant returned home and was met by Nixon outside the apartment. Nixon described the ensuing conversation as follows:

"She asked me what happened. I told her the truth. I told her that we was in there playing and I shot him. She asked me what did we tell the police. I told her nothing. And I told her what the three of us agreed on. I told her I was

going to tell the truth. She said, 'No, don't do that. I will do the talking in the house.' I told her that we was playing with the shotgun and I shot him. I then told her the story that we were going to tell the police. I told her that we had agreed to tell the police that we heard a knock from the door and that he (Clifton Eugene Wright) was shot answering the door. Told her that McClaim, Leatrice and I had agreed upon the story. She said, 'Okay.' "

While police were still questioning witnesses at defendant's apartment, Nixon at one point told defendant that he was "going to tell the truth," and defendant replied, "No, don't do that." Nixon ultimately conveyed "the false story" to the police. Leatrice Hicks and Jerome McClain gave the police substantially similar false accounts of the killing. Defendant told the police "she had no knowledge who committed this offense. . . At that time she only said that a man had—that Wright had been shot at the apartment by someone from outside. . . ."

Later on the evening of 13 March, defendant met with Nixon and McClain and suggested that the trio go to Laurinburg the next day to meet with Benjamin Chavis and his lawyer for "some legal advice." Nixon again stated he was going to tell the truth, and defendant urged him to "[w]ait until we get the legal advice we get from the lawyer. . . ."

Defendant arranged for the group to change vehicles during the excursion to Laurinburg. She expressed the fear that they were "being followed."

Upon arriving in Laurinburg, defendant met alone with Benjamin Chavis. Chavis then talked with Nixon and McClain. "Chavis said, 'What's happening. I already know what you'all told the police.' He said, 'who wasted the brother?' [Nixon] told him that we were in there playing and [he] shot [Wright]. And then he asked what did I tell the police. I told him." Chavis inquired if either Nixon or McClain intended to tell anyone the truth and pointed out the two might "get railroaded" if they did tell the truth. Chavis explained that he would talk to an attorney and then "let" Nixon and McClain "run the story down, what [they] told the police. . . ." He said, "[I]f he [attorney] go for it, we will leave it like that."

Defendant, Chavis, Nixon, McClain and Leatrice Hicks also conferred with a lawyer in a motel room in Laurinburg. De-

fendant and Chavis talked privately with the lawyer before the other three were called in. McClain described the discussion.

> "We went on in the room. Like at that time I didn't know what to say. Don didn't say anything and I didn't say anything. As the result of what Ferguson said, we didn't know whether we should tell him what exactly happened, so he rephrased the question that he asked us. He asked us what did we tell the police. And Don went on and told him the false story that we gave the police. He told him that—Don told Ferguson that me and him was in the kitchen arguing about a soda and a knock came to the door and Wright answered it and it was a shot."

After returning to Wilmington, defendant warned Nixon and McClain, "Don't drink too much and start talking. . . ."

On the night of the killing, defendant told a close friend, Willie Belon, that "a white guy knocked on the door and Wright answered the door and that's when he got shot."

Two weeks after the shooting, Nixon and McClain determined to go to the police and tell the truth. They located Leatrice Hicks who persuaded them not to talk with the police until she contacted her mother, the defendant. Unable to reach defendant, Leatrice Hicks talked with Chavis, telling him that she, Nixon and McClain were going to the police. Chavis spoke to Nixon:

> "Chavis said, 'Keep your head. That's what the pigs want you to do, break.' He said that we'd probably get railroaded for waiting so long. Said we wouldn't get a fair trial. And he would be down in a few days and talk about it."

Chavis also spoke with McClain:

> "[H]e asked me was the pigs riding my back; was they giving me a hassle. I told him, 'Yes, every day.' He told me they wanted me to break. If I break I was going to get railroaded. He said try to keep a cool head and he would be down there in a couple of days and don't do nothing until he got there. Then he said something about if they should charge, pick us up and charge any of us with it to get up touch with some lawyers. . . ."

James M. Underhill, a special agent with the Federal Bureau of Investigation, testified that in April 1971, the Justice

Department instructed him "to make an inquiry as to a possible civil rights violation in which involved the death of Clifton Eugene Wright." During the course of his investigation, Underhill interviewed defendant who told him "that she had gotten the information from her daughter and the two other young men [Nixon and McClain] that Wright had opened the door and had been shot by an unknown party. . . ." Defendant said "she had heard of a rumor that a white man had been seen running from the house."

In December of 1971, Nixon told the police he had shot Wright. He was then charged with murder and pled guilty to involuntary manslaughter.

Defendant offered no evidence. The jury found defendant guilty as charged. Defendant was sentenced to a prison term of 8 to 12 months, suspended and placed on probation for two years.

*Attorney General Robert Morgan by R. Bruce White, Jr., Deputy Attorney General, and Alfred N. Salley, Assistant Attorney General, for the State.*

*John H. Harmon for defendant appellant.*

VAUGHN, Judge.

Defendant contends that his motion for nonsuit should have been allowed. To take the case to the jury, the State was required to offer evidence tending to show:

> "(1) that the principal felon had actually committed the felony. . .; (2) that the accused knew that such felony had been committed by the principal felon; and (3) that the accused received, relieved, comforted, or assisted the principal felon in some way in order to help him escape, or to hinder his arrest, trial, or punishment." *State v. Williams,* 229 N.C. 348, 49 S.E. 2d 617.

Merely concealing knowledge regarding the commission of a crime or falsifying such knowledge does not cause a person to become an accessory after the fact.

> "Where, however, the concealment of knowledge of the fact that a crime has been committed, or the giving of false testimony as to the facts is made for the purpose of giving some advantage to the perpetrator of the crime, not on account

of fear, and for the fact of the advantage to the accused, the person rendering such aid is an accessory after the fact." *State v. Potter*, 221 N.C. 153, 19 S.E. 2d 257.

We hold that the evidence was sufficient to take the case to the jury. Defendant concedes that the State met its burden regarding proof that the felony, namely involuntary manslaughter, was committed. The felon, Nixon, told defendant that he had shot Wright while playing with the gun. There is evidence that defendant deliberately aided, comforted and encouraged Nixon in his effort to avoid detection as the killer.

On several occasions defendant successfully discouraged the felon from admitting his guilt, an admission which would have, of course, resulted in his arrest. Defendant successfully encouraged the felon to lie to those charged with the investigation of the crime so as to divert suspicion from himself and avoid detection. When questioned by investigating officers defendant concealed her knowledge that Nixon had shot and killed Wright. To divert suspicion from the real killer, she attempted to lay down a false trail for the officers to follow by telling Officer Fredlaw that someone had shot Wright from outside the apartment. She continued to help spread and extend the false trail away from the felon by publishing the same concocted story to others. She told Willie Belon, ". . . a white guy knocked on the door and Wright answered the door and that's when he got shot." As a result of the false story she had encouraged and helped spread, the Federal Bureau of Investigation made inquiry about the possibility that a civil rights violation might be involved in the death of Wright. Defendant, in April 1971, repeated the false version to the investigating federal agent, adding that she heard a rumor that "a white man had been seen running from the house. That she had been told that by Mr. Chavis. . . ."

It is manifest that defendant was not acting out of fear and equally clear that defendant's actions were calculated to and did aid the guilty felon to avoid detection and arrest.

Defendant argues that there is no evidence that she had knowledge that the crime had been committed. We hold that the evidence was sufficient to permit the jury to find that defendant knew that the unlawful killing had taken place and that Nixon was the slayer.

Defendant's argument that the court failed to explain the law arising on one of her "contentions" is without merit.

Defendant had a fair trial free from prejudicial error.

No error.

Chief Judge BROCK and Judge MORRIS concur.