McGEE, Chief Judge.
*538 Mardi Jean Ditenhafer ("Defendant") was convicted of two counts of felony obstruction of justice and one count of felony accessory after the fact to sexual activity by a substitute parent. Defendant contends the trial court erred in denying her motions to dismiss the charges and in its instruction to jurors regarding accessory after the fact. We uphold Defendant's conviction for obstruction of justice by causing her daughter to recant the report of sexual abuse, but we vacate Defendant's *539 conviction for obstruction of justice based on denying investigators access to the daughter. We also vacate Defendant's conviction for being an accessory after the fact for her failure to report a crime.
I. Factual and Procedural History
The evidence at trial tended to show that in 2013, Defendant was married to William Ditenhafer ("William"). The couple had two children, a daughter ("the daughter") and a younger son ("the son"). The daughter is Defendant's biological daughter and was adopted by William when she was in the third grade. The son is the biological son of Defendant and William.
The relationship between William and the daughter was initially positive. However, in middle school, the daughter's grades began to drop as a result of self-esteem issues, and she began to harm herself. William punished the daughter for her dropping grades with corporal punishment, which "scared [her] a lot with his anger and his yelling, um, and the spankings." The daughter tried to bring her self-esteem and self-harming issues to the attention of Defendant, but Defendant grew angry with the daughter and claimed the daughter was only seeking attention. As a result of her parents' anger at her, the daughter believed she was a painful burden on the family.
During eighth grade, the daughter began sending sexually suggestive pictures of herself by text message to a boy. William discovered the photos, and he and Defendant grounded the daughter. Rather than seek professional counseling for the daughter, William, with Defendant's knowledge, began to give the daughter full-body massages under the guise of improving her self-image. William gave the massages to the daughter once a week while she was covered only by a towel.
After one of the massages, the daughter took a shower to remove oil from her body. After the shower, as the daughter was walking to her room with a towel wrapped around her body, William called her into the living room where he was seated on the couch. A television displayed several suggestive photographs that the daughter had again sent to the boy by text message. William told the daughter he had been looking at the photos and that they "turned [him] on." He then gave the daughter an ultimatum: either stimulate his penis with her hand or he would show the photos to Defendant and have the daughter sent to jail. The daughter began to cry and refused for several minutes, but ultimately relented. William then took off his pants and instructed the daughter to drop her towel. He guided her hand along his penis until he ejaculated. William made the daughter touch his penis at least twice a week thereafter.
*540 William's abuse of the daughter eventually expanded to include making her perform fellatio on him on at least three occasions, and he gave her a book with instructions on how to perform sex acts. The daughter did not tell Defendant about these incidents because she feared Defendant would not believe her and would punish her.
The daughter turned sixteen on 27 November 2012. Thereafter, William had vaginal intercourse with her on multiple occasions. He also penetrated her vagina with vibrators *899 and his fingers several times and attempted anal penetration on several occasions. He also bought her sexually suggestive clothing to wear for him, took sexually suggestive videos and photographs of her in those outfits and various stages of undress, and sent her explicit email messages requesting sexually suggestive photographs from her. The daughter attempted to hint to Defendant that she was being abused by leaving her undergarments in Defendant's and William's bed; when confronted, William told Defendant that the daughter had just been napping in their room. Defendant grew upset with the daughter for taking naps in her bed, making the daughter once again fearful of telling her mother the truth.
William's abuse further exacerbated the daughter's self-harming. She began to cut parts of her body that William told her were attractive, such as her shoulders and bellybutton. The daughter attempted suicide several times by slicing her wrists, taking pills, and attempting to drown herself. When Defendant noticed the daughter's bandaged wrists after one such attempt, she told the daughter that she thought it was just another ploy for attention.
In the spring of 2013, when she was sixteen, the daughter visited her biological paternal aunt ("the aunt") in Arizona. The night before she was to fly home, the daughter informed the aunt that she was being sexually abused and raped by her adoptive father. The aunt and the daughter called Defendant to tell her of the abuse and informed Arizona law enforcement. Rather than feeling supported after the call to her mother, the daughter felt that Defendant was "angry at [her]."
A short time after reporting the abuse to the aunt, the daughter flew home to North Carolina and was picked up at the airport by Defendant. Defendant told the daughter she did not believe her, that she needed to recant, and that she needed to stop lying because "it was going to tear apart the family and it was just going to end horribly and that [the daughter] didn't need to do this." The daughter reiterated to her mother that the abuse occurred.
*541 The daughter and Defendant met with Susan Dekarske ("Ms. Dekarske") with Wake County Child Protective Services ("CPS") and Detective Stan Doremus ("Detective Doremus") with the Wake County Sheriff's Department ("WCSD") on 11 April 2013 in Defendant's home. The daughter described William's abuse of her. CPS, William, and Defendant entered into a safety agreement whereby William was removed from the home during the investigation into the abuse. The daughter started seeing a therapist, Elizabeth Guarnaccia ("Ms. Guarnaccia"). The daughter met with CPS and WCSD several times over the following months with Defendant present or within listening distance. On almost a daily basis, Defendant pressured the daughter to recant her allegations, including yelling at her, threatening to have her involuntarily committed to a psychiatric hospital, calling her crazy and a "manipulative bitch," and telling the son that his sister was crazy. Defendant told the daughter that she "was tearing apart her family and destroying her family and that William was going to go to jail ... and [the son] was going to turn into a drug addict and drop out of high school" as a result of the daughter's reports of abuse.
Defendant severed the daughter's contact with her family in Arizona and told her she would never see them again. Defendant later cancelled a trip the daughter had planned to take to Arizona, as well as a family trip to a Disney theme park, telling the daughter her allegations of abuse were "going to [cause the family to] lose our money and ... our stuff and the animals[.]" Defendant then told the daughter they could go to Disney if she recanted her allegations against William. At one point, Defendant told the daughter Defendant had breast cancer and that the daughter needed to recant to relieve the stress it was putting on Defendant. Defendant also began to videotape the daughter, demanding that she recant on film. Defendant also monitored all the daughter's phone calls and texts. Defendant told the daughter she wished William could come back to the home. Finally, Defendant used the above facts and assertions to turn the daughter's grandmother and the son against the daughter.
*900 As a result of Defendant's conduct, the daughter did not feel safe at home, and considered leaving. Her thoughts of suicide returned. Ms. Dekarske testified that "[f]or the majority part of the investigation, [the daughter] continued to inform [her] that [Defendant] was pressuring her to recant the story[,]" and Ms. Guarnaccia testified that "[the daughter] said that her mother [Defendant] asked her to lie to [Ms. Guarnaccia], to CPS, to the detectives, that her mother did not believe her and wanted *542 her to recant because [the abuse] didn't happen." Defendant denied to Ms. Dekarske that she was coercing the daughter to recant.
Defendant's attempts to influence the investigation into the daughter's abuse were not limited to her treatment of the daughter. Defendant and the daughter met with Ms. Dekarske and Detective Doremus on 21 June 2013. Detective Doremus testified that Defendant was seated "[s]houlder to shoulder" with the daughter, and with "her hand on [the daughter's] thigh virtually the whole time[.]" He further testified that "[i]t appeared to [him] as though [ ] [D]efendant was answering the questions for [the daughter]. The questions that were being asked of [the daughter], as soon as [the daughter] opened her mouth to talk, Defendant would answer the questions." At one point, Defendant told Detective Doremus that "there is some truth to everything that [the daughter] says but not all of it is true." Defendant also told Ms. Dekarske that "she believe[d] [the daughter] in regards to what she had disclosed; however, she still did not believe it was William who did that to her." Defendant openly expressed discomfort with the investigation at the conclusion of the interview and told Detective Doremus that she would not permit the daughter to speak with him alone. When Detective Doremus informed her that she could not prohibit such a meeting, Defendant reiterated that she was not going to authorize the daughter to meet with Detective Doremus alone.
On 11 July 2013, the daughter was scheduled to meet with Ms. Dekarske and Detective Doremus at CPS's offices and, as Defendant drove the daughter to the meeting, the daughter told Defendant that she was going to recant because she could no longer handle the pressure of Defendant's constant scolding. Defendant then began to "coach" the daughter, telling her what she should say. Defendant allowed the daughter to meet with Ms. Dekarske and Detective Doremus outside of her presence.
In the meeting, the daughter told Ms. Dekarske and Detective Doremus that, while riding to the meeting, she had told Defendant she would recant but that she would not do so because the allegations of abuse were true. As the meeting continued, the daughter received text messages from Defendant asking what was happening and how long the meeting would take. As a result of the daughter's statement, the text messages, and his prior interactions with Defendant, Detective Doremus knew at this point in the interview that "we had probably a limited amount of time to talk to her before [Defendant] pulled her out of that meeting[.]" Detective Doremus asked the daughter about emails, printouts, and other evidentiary documents indicating William's abuse of the daughter. Defendant soon entered the room and interrupted the *543 interview. Detective Doremus testified that Defendant sat down at the table with "a smirk on her face" and when he informed Defendant that the daughter had not recanted, Defendant "became angry." Ms. Dekarske and Detective Doremus showed Defendant documentary evidence of explicit and sexually suggestive emails sent to the daughter from their home's internet provider. Defendant grew irate, said the emails "[don't] explain anything[,]" and terminated the interview.
Defendant continued to pressure the daughter to recant her allegations of abuse and, on 5 August 2013, following a meeting in her home with Defendant and Ms. Dekarske, the daughter recanted her report of abuse. In the meeting, Defendant had sought clarification from Ms. Dekarske concerning her obligation to cooperate with local law enforcement. As Ms. Dekarske was pulling out of the driveway, the daughter approached her car window and told Ms. Dekarske that she had made up everything. The daughter spoke in a "very robotic [manner], saying something [as if it had] been rehearsed for *901 her to say." Ms. Dekarske saw Defendant watching her and the daughter from a window.
Two days later, the daughter contacted Detective Doremus by phone and recanted her report of abuse. During the call, Detective Doremus heard a third person on the line. The daughter later e-mailed a recantation to Detective Doremus, with Defendant "prompt[ing] [the daughter] on what to write, and [the daughter] typ[ing] it up in [her] e-mail." Detective Doremus followed up with the daughter in person at her school on 29 August 2013. The daughter told Detective Doremus at the outset of the meeting that she was not supposed to speak to him, to which he responded: "Don't worry. I'm not going to ask you any questions." He explained to her that the investigation into her abuse was ending as a result of her recantation and there would be no prosecution.
In a therapy session with Ms. Guarnaccia on 10 October 2013, and attended by Defendant, the daughter once more recanted her report of abuse, telling Ms. Guarnaccia that she was recanting not because the abuse did not occur, but instead because she "didn't like what [she] was doing to [her] family." The daughter's explanation upset Defendant and the daughter then denied the abuse outright. Ms. Guarnaccia later informed Ms. Dekarske that the daughter had told her: "I am recanting, but [the abuse] did happen."
By Thanksgiving 2013, William was back in the family home. His abuse of the daughter resumed within a week, "just like [it] never stopped." The daughter felt she could not report the abuse to Defendant again because of Defendant's previous response and conduct in the prior investigation.
*544 In early February 2014, William demanded sex from the daughter, who was then seventeen. She "zoned out" and complied, allegedly coerced out of fear of William because "he was still angry and big, and [she] didn't want to get hurt, and [she] didn't want what happened with [her] family to happen again." As William and the daughter were engaged in intercourse on Defendant's and William's bed, Defendant walked into the bedroom and witnessed the abuse. The daughter ran into another room.
Defendant began to interrogate her naked and crying daughter, asking if this was her first time having sex or if she had previously lost her virginity. The daughter told Defendant she had previously had sex with her boyfriend, and testified that she was afraid to tell her mother that her prior allegations against William were true. Defendant had witnessed William's abuse of the daughter on the same day that she was scheduled to meet with Detective Doremus to pick up a cell phone that had been searched for evidence in the earlier investigation. After questioning her daughter, Defendant had her get dressed and accompany her to a McDonald's restaurant where the exchange with Detective Doremus was to occur. Detective Doremus had arrived early, and watched Defendant and the daughter park. After parking, the daughter told Defendant that everything she had reported in the earlier investigation was true, to which Defendant replied: "I'm not sure if I believe you or not[.]" Detective Doremus watched Defendant and the daughter argue for a few minutes, and then exited his vehicle to retrieve the cell phone from the trunk. Defendant met him at the rear of his car, took the phone, and left. Defendant said nothing to Detective Doremus about the abuse she had witnessed earlier that same day. Defendant did not tell Detective Doremus about the conversation she had just had with her daughter, in which the daughter asserted the truth of the prior allegations of abuse.
Defendant then left the McDonald's restaurant to take the daughter back home, where she planned to leave her with William and the son while Defendant was at work. The daughter protested, and Defendant allowed her to spend the night at a friend's house instead. Defendant picked up her daughter the following morning and returned her to the home with William. Defendant permitted William to stay in the home for another month before requiring him to move.
On 19 March 2014, more than a month after the abuse and after William moved out of the house, Defendant called William's brother and told him she had witnessed William's abuse of the daughter. William's brother *902 told Defendant she needed a lawyer, and she asked him why. She then told him she would talk to an attorney. Defendant continued to talk to William's brother, telling him at various times that the daughter *545 and William "were in therapy" and that the lawyer had advised her she "was doing everything correctly and ... to not involve anyone else or the authorities because that would cost ... more money and time." Defendant also told him she was hopeful that William could move back home. Defendant spoke with the daughter several times about allowing William to move back in the future, and told her daughter not to report the abuse because "it was family business."
After Defendant witnessed William abusing the daughter, Defendant told the daughter she "forg[ave] her" and that they should gather up all the pillows and sheets on Defendant's bed from the day she witnessed the abuse and "anything else that [William] might have used with [the daughter]." After collecting the linens, Defendant tossed them into the backyard with the family dog because he liked to chew things up. Eventually, Defendant and the daughter threw the items away.
William's brother sent an email to CPS in late April 2014 to report William's abuse of the daughter. The next day, CPS interviewed him, and he informed Defendant that CPS was again involved. Defendant responded that she knew CPS had spoken with the daughter and the son, and called CPS's new investigation "a nightmare." She later called her brother-in-law, was "very angry" with him, accused him of reporting the abuse to CPS, and reiterated that the investigation "was a nightmare."
Following the report by William's brother, a CPS assessor met the daughter at her school and the daughter denied the abuse reported by William's brother "[b]ecause it's what [she] was told to do by [Defendant]." The daughter called Defendant to alert her that a new CPS investigation was underway. Defendant picked her up from school and then travelled to the son's school to prevent CPS from meeting with him, but the assessor had already begun her interview with the son without prior notice to Defendant. The assessor testified at trial that, in the course of the interview, Defendant:
burst into the conference room and grabbed [the son] and said, "Absolutely not. You're not going to talk to him. You are not going to talk to him. This is not happening."
She said [to the son], "Go get your book bag. I'm signing you out of school."
...
She was very angry. She was very angry and just said, "I have nothing to say to you. I have nothing to say to you." And she just grabbed [the son] and walked out.
*546 Two days later, on 30 April 2014, Defendant agreed to speak to CPS at her home. Despite heavy rain, wind, and thunder, Defendant refused to allow the CPS assessor inside, and insisted that the interview take place outside the home. Rather than confirm the abuse she had witnessed firsthand, Defendant informed the assessor that she was separated from William and that he was no longer allowed in the house "to avoid any more lies from [the daughter]." She told the assessor that CPS and its agents were not permitted to speak to her children at school unless a parent or attorney was present, and that the only place she would authorize contact would be outside her home. The assessor then discussed alternative temporary living arrangements for the children. At no point in the interview did Defendant state that she witnessed William's abuse of the daughter. In fact, Defendant never disclosed that information to CPS in the course of its investigation.
Warrants for Defendant's arrest were issued on 1 May 2014 for felony obstruction of justice and felony accessory after the fact to William's abuse of the daughter. A grand jury issued two indictments on those charges on 20 May 2014, charging Defendant with one count of accessory after the fact and one count of felony obstruction of justice. The grand jury returned a superseding indictment on 9 September 2014 for one count of accessory after the fact to sexual activity by a substitute parent. The superseding indictment for accessory after the fact alleged that Defendant "unlawfully, willfully and feloniously *903 did knowingly assist William ... in escaping detection, arrest or punishment by not reporting the incident after he committed the felony of Sexual Activity by a Substitute Parent."
Defendant moved for a bill of particulars concerning the indictment for obstruction of justice, which was denied by the trial court after the State agreed to resubmit the charge to the grand jury to resolve any deficiencies in the initial indictment. The State returned a superseding indictment for felony obstruction of justice on 10 March 2015, which alleged two separate counts:
I. ... [D]efendant ... unlawfully, willfully, and feloniously obstructed justice with deceit and intent to defraud and obstruct an investigation into the sexual abuse of a minor to wit: [ ] [D]efendant facilitated and encouraged [the] daughter ... to recant allegations of sexual abuse against [William]....
II. ... [D]efendant ... unlawfully, willfully, and feloniously obstructed justice with deceit and intent to defraud *547 and obstruct an investigation into the sexual abuse of a minor to wit: [ ] [D]efendant denied [WCSD] and [CPS] access to [the] daughter ... throughout the course of the investigation....
Defendant was tried on two charges of felony obstruction of justice and one charge of accessory after the fact on 26 May 2015. After the close of evidence, Defendant moved to dismiss each charge for insufficient evidence and for "a variance between the crime alleged in the indictment and any crime for which the State's evidence may have been sufficient[.]" The trial court denied Defendant's motions. A jury found Defendant guilty on all counts. Defendant gave notice of appeal in open court.
II. Analysis
Defendant argues on appeal that the trial court erred in: (1) denying her motions to dismiss the two charges of obstruction of justice for insufficiency of the evidence; (2) denying her motion to dismiss the accessory after the fact charge for insufficiency of the evidence; and (3) failing to limit Defendant's culpable conduct in its jury instruction for accessory after the fact to her failure to report abuse. While we hold that the trial court properly denied her motion to dismiss the charge of obstruction of justice for pressuring her daughter to recant, we agree with Defendant that the trial court erred in failing to dismiss the remaining charges.
A. Motion to Dismiss the Charge of Obstruction of Justice by Pressuring the Daughter to Recant
We review a denial of a motion to dismiss for insufficient evidence de novo . State v. Cousin , 233 N.C. App. 523, 529, 757 S.E.2d 332, 338 (2014) (citation omitted). Such review is focused on "whether there is substantial evidence (1) of each essential element of the offense charged ..., and (2) of defendant's being the perpetrator[.]" State v. Fritsch , 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation and quotation marks omitted), cert. denied , 531 U.S. 890, 121 S.Ct. 213, 148 L.Ed.2d 150 (2000). Our Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith , 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). Such substantial evidence may be "direct, circumstantial, or both[,]" State v. Locklear , 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988), and we consider it "in the light most favorable to the State with every reasonable inference drawn in the State's favor." Cousin , 233 N.C. App. at 529-30, 757 S.E.2d at 338 *548 (citing State v. Rose , 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), cert. denied , 515 U.S. 1135, 115 S.Ct. 2565, 132 L.Ed.2d 818 (1995) ).
Obstruction of justice is generally a common law misdemeanor committed by one who performed "acts which obstruct, impede or hinder public or legal justice[.]" State v. Wright , 206 N.C. App. 239, 242, 696 S.E.2d 832, 835 (2010) (citation and quotation marks omitted). However, N.C. Gen. Stat. § 14-3(b) (2015) states that "[i]f a misdemeanor offense as to which no specific punishment is prescribed be infamous, done in secrecy and malice, or with deceit and intent to defraud, the offender shall ... be guilty of a Class H felony." The elements of felony obstruction of justice are therefore (1) unlawfully and willfully (2) acting to prevent, obstruct, impede, *904 or hinder justice (3) in secret and with malice or with deceit and intent to defraud. See, e.g., Cousin , 233 N.C. App. at 531, 757 S.E.2d at 339 (holding no error in denying a motion to dismiss a charge of felony obstruction of justice where there was sufficient evidence the defendant "(1) unlawfully and willfully (2) obstructed justice by providing false statements to law enforcement officers investigating [a crime] (3) with deceit and intent to defraud").
This State's appellate courts have recognized " 'a policy against parties deliberately frustrating and causing undue expense to adverse parties gathering information about [wrongdoing.]' " Wright , 206 N.C. App. at 242, 696 S.E.2d at 835 (quoting Henry v. Deen , 310 N.C. 75, 87-88, 310 S.E.2d 326, 334-35 (1984) ). Thus, a person obstructs justice, in either the civil or criminal context, " '[w]here, as alleged here, a party deliberately [acts] to subvert an adverse party's investigation of [wrongdoing.]' " Wright , 206 N.C. App. at 242, 696 S.E.2d at 835 (quoting Henry , 310 N.C. at 87-88, 310 S.E.2d at 334-35 ) (first alteration in original).
Defendant argues there was insufficient evidence of any willful intent on the part of Defendant to obstruct justice in encouraging the daughter to recant. Specifically, Defendant contends that "the only 'purpose' the State's evidence showed [Defendant] acted with was the purpose of getting [the daughter] to tell what [Defendant] believed was the truth[,]" and that "[t]he State's evidence does not support a conclusion that [Defendant] was encouraging [the daughter] to recant with the willful intent to ... hinder the investigation of [the daughter's] allegations." We disagree.
The daughter testified at length about Defendant's actions pressuring her to recant. The State's evidence showed that Defendant did more than simply encourage the daughter to tell the truth-an act that certainly would not constitute obstruction of justice on its own. Defendant directed the daughter specifically to aver that William had not, as a *549 matter of fact, abused her. When the daughter did not make the specific factual statement to investigators desired by Defendant, Defendant actively punished her, verbally abused her, and turned her immediate family against her. Defendant did so even after she admitted to Detective Doremus and Ms. Dekarske that she believed the daughter had been abused. Defendant coached the daughter on what to say in person, on the telephone, and in emails in order to recant.
This evidence was sufficient to allow a reasonable juror to infer that Defendant's conduct was designed to effect a particular outcome-the end of the criminal and administrative investigation that Defendant believed was "tearing apart her family and destroying her family" and "going to [cause the family to] lose [their] money and ... stuff and the[ir] animals"-directly contrary to the State's investigative aims of determining whether abuse had occurred and who perpetrated any abuse. Even after Defendant witnessed first-hand William's abuse of the daughter, she declined to report the abuse because it "would cost them more money and time" and later described the subsequent CPS investigation into that abuse as "a nightmare." Viewing all the evidence in the light most favorable to the State and giving it the benefit of every reasonable inference drawn therefrom, it was reasonable for the jury to find that Defendant intended to obstruct justice when she pressured the daughter to recant, and the trial court did not err in denying the motion to dismiss the charge for lack of sufficient evidence of this element of the offense.
Defendant next contends that there was insufficient evidence to support the conclusion that Defendant's actions were committed with deceit and the intent to defraud necessary to elevate the charges to felony obstruction of justice under N.C. Gen. Stat. § 14-3(b). However, as detailed above, Defendant told Detective Doremus and Ms. Dekarske that she believed the daughter had been abused by someone but nonetheless pressured her into recanting in order to halt any investigation into that abuse. Ms. Guarnaccia testified the daughter told her that Defendant "asked [the daughter] to lie to [Ms. Guarnaccia], to CPS, to the detectives .... [The daughter] felt she was under a lot of pressure and felt she had to lie." (emphasis added). When confronted by Ms. Dekarske *905 about her coercive conduct, Defendant denied pressuring the daughter. Once again, viewing all the evidence in the light most favorable to the State and giving it the benefit of every reasonable inference drawn therefrom, it was sufficient to allow a reasonable inference that Defendant acted with the deceit and intent to defraud necessary to commit felony common law obstruction of justice. *550 B. Defendant's Motion to Dismiss the Felony Obstruction of Justice Charge for Denial of Access
Defendant next argues that, because she never denied any request from CPS or WCSD for an interview with the daughter, no evidence supported the superseding indictment's second charge that Defendant obstructed justice by "den[ying] [WCSD] and [CPS] access to [the daughter], throughout the course of the investigation." We agree.
Defendant is correct that the State presented no evidence of a specific instance in which Defendant expressly denied a request by WCSD or CPS to interview the daughter. Indeed, Ms. Dekarske testified that Defendant "allowed me access to [the daughter] and also to speak with [her]. There was never a time that [Defendant] did not allow me access to [the daughter]." Similarly, the State concedes that Defendant allowed Detective Doremus to meet with the daughter on multiple occasions without Defendant being present, and there is no evidence in the record demonstrating that a request to interview, meet, or contact the daughter by Detective Doremus was ever denied by Defendant.
The State nevertheless argues that WCSD and CPS were denied "full access" because Defendant was present in many interviews. But the delineation between "access" as alleged in the indictment and "full access" as advanced by the State on appeal would create an unworkable distinction in our jurisprudence. If WCSD and CPS believed that Defendant's presence in any interview constituted interference, they could have asked Defendant to leave. If Defendant, in exercising her rights as a parent, refused such a direct request, WCSD and CPS could have sought a court order compelling her nonattendance. N.C. Gen. Stat. § 7B-303(a) (2015) ("If any person obstructs or interferes with an assessment ... the director may file a petition naming that person as respondent and requesting an order directing the respondent to cease the obstruction or interference."). Detective Doremus appeared well aware of WCSD's and CPS's ability to do so, telling Defendant outright that she could not prohibit his speaking with the daughter alone.
In short, there is no evidence that tends to show Defendant ever "denied [WCSD] and [CPS] access to [the] daughter ... throughout the course of the investigation" as alleged in the indictment. Defendant complied with every request for CPS, counselors and WCSD to interview the daughter. Though she was present at many interviews and unilaterally ended one, she was within her rights as a parent to do so, and neither WCSD nor CPS sought to mitigate or curtail such conduct by Defendant. In the light most favorable to the State, the evidence was insufficient to *551 send the felony obstruction of justice charge for denial of access, as set forth in the indictment, to the jury, and the trial court erred in denying her motion to dismiss this count. In vacating Defendant's conviction for obstruction of justice, we do not decide whether Defendant's acts of interference-including speaking over the daughter to answer investigators' questions, telling investigators that the daughter was not to be believed, and abruptly removing the daughter from one interview after learning that she was not recanting and was being asked to authenticate material documentary evidence-could have supported an obstruction charge. But that conduct was not within the scope of the plain meaning of denying investigators "access" to the daughter, as alleged in the indictment.
C. Defendant's Motions to Dismiss the Accessory After the Fact Charge
Defendant identifies two grounds for this Court to hold that the trial court erred in denying her motion to dismiss the accessory after the fact charge. First, she argues that merely failing to report a crime does not render a defendant an accessory after the fact, and the State therefore failed to prove *906 any actus reus . Second, and assuming that Defendant's failure to report was not culpable conduct, Defendant argues that evidence that she destroyed evidence and discouraged others from reporting abuse is a fatal variance from the conduct alleged in the charging document. We agree with Defendant's first argument and therefore do not reach her fatal variance argument.
N.C. Gen. Stat. § 14-7 provides that "[i]f any person shall become an accessory after the fact to any felony, whether the same be a felony at common law or by virtue of any statute made, ... such person shall be guilty of a crime[.]" N.C. Gen. Stat. § 14-7 (2015). To support a conviction under the statute, the State must prove three elements: "(1) a felony was committed; (2) the accused knew that the person he received, relieved or assisted was the person who committed the felony; and (3) the accused rendered assistance to the felon personally." State v. Earnhardt , 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982) (citations omitted). "[P]ersonal assistance in any manner so as to aid a felon in escaping arrest or punishment is sufficient to support a conviction as an accessory." State v. Brewington , 179 N.C. App. 772, 776, 635 S.E.2d 512, 516 (2006) (citations omitted).
Defendant takes no issue with the sufficiency of the State's evidence as to the first two elements-the commission of a felony and her *552 knowledge of the perpetrator.[1] She instead argues that merely failing to report a crime, in and of itself, is not enough to support a conviction for accessory after the fact. Both Defendant and the State, which disagrees with Defendant's argument, cite our Supreme Court's decision in State v. Potter , 221 N.C. 153, 19 S.E.2d 257 (1942), as dispositive of the issue.
In Potter , the defendant witnessed an assault and drove the assailant away from the scene of the crime in his car. Id. at 154, 19 S.E.2d at 258. The defendant was interrogated by police, and denied that the assault had occurred and that he had given a ride to the perpetrator. Id. at 155, 19 S.E.2d at 258. The defendant was convicted as an accessory after the fact. Id. On appeal, our Supreme Court noted that "one [is not] an accessory after the fact who, knowing that a crime has been committed, merely fails to give information thereof[.]" Id. at 156, 19 S.E.2d at 259 (internal quotation marks and citation omitted). The Court further explained, however, that
the concealment of knowledge of the fact that a crime has been committed, or the giving of false testimony as to the facts is made for the purpose of giving some advantage to the perpetrator of the crime, not on account of fear, and for the fact of the advantage to the accused, the person rendering such aid is an accessory after the fact.
Id. (internal quotation marks and citation omitted). As a result, the Supreme Court upheld the conviction. Id.
The State contends the above language in Potter criminalizes the inaction or omission of failing to report in the present case. We disagree. Potter involved affirmative actions on the part of the defendant who rendered personal assistance to the perpetrator, including acting as a getaway driver and denying any knowledge of a crime to police when asked by police. Id. at 154-55, 19 S.E.2d at 258. Subsequent cases similarly criminalize only such active conduct. See, e.g., State v. Hicks , 22 N.C. App. 554, 557, 207 S.E.2d 318, 320 ("Merely concealing knowledge regarding the commission of a crime or falsifying such knowledge does not cause a person to become an accessory after the fact."), cert. denied , 285 N.C. 761, 209 S.E.2d 286 (1974) ;
*553 Earnhardt , 307 N.C. at 69, 296 S.E.2d at 653 (holding evidence that defendant was "concocting a tale" supported a charge of accessory after the fact).
The dissenting opinion cites *907 State v Wright , 206 N.C. App. 239, 696 S.E.2d 832 (2010) to support the position that this Court has upheld omissions as felonies. While the defendant in Wright did fail to report certain campaign contributions-an omission-he also actively filed a campaign disclosure form that was "not complete, true, and correct." Id. at 248, 696 S.E.2d at 838. It was both the concealment and the filing of an incomplete report that lead to his indictment and subsequent conviction for obstruction of justice, not merely his omission.
Here, the indictment charging Defendant as an accessory after the fact "by not reporting" William's abuse of the daughter is contrary to our precedent. And while it is true that North Carolina mandates reporting of actual or suspected child abuse and criminalizes a breach of this duty as a misdemeanor, N.C. Gen. Stat. § 7B-301 (2015), Defendant was not charged with violation of this statute in her indictment. As written, the indictment in the present case fails to allege any criminal conduct on the part of Defendant, and we hold that the trial court erred in denying Defendant's motion to dismiss this charge.
Our decision vacating Defendant's conviction for accessory after the fact is based upon the failing in the indictment, which alleges a crime based upon a mere omission, contrary to precedent. We do not address whether Defendant's affirmative acts, such as destroying physical evidence of William's sexual activity with the daughter and of telling investigators that the later report of abuse was just "more lies" by the daughter, would support an accessory charge, because those activities are plainly beyond the scope of the charge stated in the indictment.
III. Conclusion
For the foregoing reasons, we hold that the trial court did not err in denying Defendant's motion to dismiss her charge for felony obstruction of justice by pressuring the daughter to recant. However, we do hold that the trial court erred in denying Defendant's motions to dismiss the remaining charges for felony obstruction of justice and accessory after the fact.
NO ERROR IN PART, REVERSED IN PART.
Judge TYSON concurs.
Judge INMAN concurs in part and dissents in part with separate opinion.

William was arrested and ultimately pleaded guilty to six felony charges arising from his abuse of the daughter. In re W.C.D. , 793 S.E.2d 286, No. COA16-351, 2016 WL 6695866 *1 (N.C. Ct. App. Nov. 15, 2016). William is currently serving a minimum of 192 months and a maximum of 291 months in prison from his guilty plea. Id. at *1. Therefore, there is no issue as to the felony underlying the accessory after the fact charge against Defendant, and she raised none on appeal.