IN THE SUPREME COURT OF NORTH CAROLINA

No. 126A18

Filed 1 November 2019

STATE OF NORTH CAROLINA

v.

MARDI JEAN DITENHAFER


Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 812 S.E.2d 896 (2018), finding no error in part and reversing in part judgments entered on 1 June 2015 by Judge Paul G. Gessner in Superior Court, Wake County. On 20 September 2018, the Supreme Court allowed the State's petition for discretionary review of additional issues. Heard in the Supreme Court on 10 April 2019.

*Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Assistant Attorney General, for the State-appellant.*

*Jarvis John Edgerton, IV for defendant-appellee.*


HUDSON, Justice.

Here we must decide whether the Court of Appeals erroneously determined that the trial court erred by denying defendant's motion to dismiss charges of felonious obstruction of justice and accessory after the fact to sexual activity by a substitute parent. After careful consideration of the record in light of the applicable law, we affirm in part and reverse in part the Court of Appeals' decision, and remand

this case to that court to determine whether there is sufficient evidence to enhance the charge of obstruction of justice for denying access to Jane from a misdemeanor to a felony under N.C.G.S. § 14-3(b).

I. <u>Factual and Procedural Background</u>

A. <u>Factual Background</u>

Defendant Mardi Jean Ditenhafer is the mother of Jane, born on 27 November 1996, and John, born in September 2004.[1] William Ditenhafer began living with defendant and Jane when Jane was five years old. When Jane was in the third grade, Mr. Ditenhafer adopted her. After Jane started middle school, defendant began working outside of the home during the week and was away from the home "almost . . . all day." As a result, Mr. Ditenhafer was left alone with Jane and John.

When Jane was in the eighth grade, she began e-mailing sexually suggestive pictures to a boy. After defendant and Mr. Ditenhafer learned about these images, defendant threatened to call the police if Jane engaged in similar conduct in the future.

When Jane was fifteen years old, defendant and Mr. Ditenhafer decided that Mr. Ditenhafer would give Jane weekly full-body massages for the ostensible purpose of improving her self-esteem. After one of these massages, Mr. Ditenhafer sent Jane to take a shower. As Jane walked to her room wearing only a towel following her

---

[1] "Jane" and "John" are pseudonyms employed for ease of reading and the protection of the children's identities.

shower, Mr. Ditenhafer called her into the living room, where he displayed additional sexually suggestive pictures that Jane had sent to the same boy as earlier, and told Jane that either he would show the new pictures to defendant or Jane could "help him with his . . . boner." Fearing he would tell her mom about the photos, Jane complied with his instructions to discard the towel and sit next to him; Mr. Ditenhafer then guided Jane's hand to his penis until he ejaculated.

After a couple of weeks of similar behavior, Mr. Ditenhafer began compelling Jane to perform oral sex upon him. Jane did not tell defendant about the abuse because she "didn't think [defendant] would believe [her] and [ ] would get angry at [her] for making up a lie." Once Jane reached the age of sixteen, Mr. Ditenhafer engaged in vaginal intercourse with her on multiple occasions.

During her ninth-grade year, Jane visited her aunt in Phoenix, Arizona. Jane told her aunt, Danielle Taber, that Mr. Ditenhafer had been sexually abusing her. When Jane and Ms. Taber called defendant to inform her about the ongoing abuse, defendant became angry at Jane. Even so, Ms. Taber called the local police, who began an investigation. On 9 April 2013, the Arizona law enforcement agency investigating Jane's allegations notified the Wake County Sheriff's Office about the sexual abuse that Jane was alleging.

Jane returned to North Carolina two days after her conversation with Ms. Taber. As they returned home from the airport, defendant told Jane that she did not believe her allegations and stated that Jane needed to "tell the truth and recant . . .

because it was going to tear apart the family and it was just going to end horribly." Subsequently, defendant tried to have Jane admitted to a mental health facility and told John that "Your sister's crazy," and that the family "need[ed] to get her help."

In the aftermath of Jane's return to North Carolina, defendant continued to urge Jane to "tell the truth because [Jane] was tearing apart her family," warned that "[Mr. Ditenhafer] was going to go to jail because of [her] lies," said that "[John] was going to turn into a drug addict and drop out of high school" because of what Jane was doing, and called Jane "a manipulative bitch." Defendant prevented Jane from talking to her Arizona relatives until Jane "called up [her] aunts and told them that [she] was lying." In addition, defendant threatened to call off a trip to Disneyland if Jane did not recant, stating that "Disney is not going to happen because we're going to lose our money" and that, "if you recant and tell the truth, . . . then we can go to Disney." In the same vein, defendant claimed that the family would "lose our stuff and the animals" if Jane did not recant. Finally, defendant told Jane that defendant might have breast cancer and that Jane "needed to stop this" because it was making the stress that she was experiencing as a result of her possible malignancy worse.

As a result of the ongoing investigation into Jane's allegations, Mr. Ditenhafer left the family home and Jane began meeting with Susan Dekarske, a social worker with the Wake County Child Protective Services Division of Wake County Human Services. Defendant was usually present or "in listening distance" during these meetings. On 21 June 2013, Detective Stan Doremus of the Wake County Sheriff's

Office and Ms. Dekarske interviewed Jane at the family home. According to Detective Doremus, defendant had her hand on Jane's thigh "virtually the whole time." Detective Doremus indicated that Jane "didn't say a whole lot" because, "as soon as [she] opened her mouth to talk, Defendant would answer the questions." In the course of this interview, defendant told Detective Doremus and Ms. Dekarske that "there is some truth to everything that [Jane] is saying but not all of it is true."

On 11 July 2013, defendant allowed Jane to meet with Detective Doremus and Ms. Dekarske alone because defendant thought that Jane intended to recant her accusations against Mr. Ditenhafer. Prior to the meeting, defendant told Jane to tell Detective Doremus and Ms. Dekarske that she had "made it all up" because she "just wanted [Mr. Ditenhafer] out of the house" and "was just angry at everyone." At the meeting, however, Jane told Detective Doremus and Ms. Dekarske that "[m]y mom thinks I'm in here to recant, but I'm not because I'm telling the truth" and that she did not "know what to do because I can't take it at home anymore."

As the meeting progressed, defendant began sending text messages to Jane in which she inquired "what's going on, are you almost done[?]"As Detective Doremus and Jane discussed certain e-mails that Mr. Ditenhafer had sent Jane, defendant entered the room and interrupted the interview with a "smirk on her face." At that point, Detective Doremus told defendant that "I'm not sure what you thought [Jane] was going to tell us, but she didn't recant" and showed defendant the e-mails that had been exchanged between Mr. Ditenhafer and Jane. In response, defendant

became angry, stated that "it doesn't explain anything," and departed abruptly, taking Jane with her.

As a result of the pressure that she was receiving from various family members, including John, Jane decided to recant her accusations against Mr. Ditenhafer. In essence, Jane "didn't want to lose [John,] so [she] recanted."

On 5 August 2013, Ms. Dekarske went to the family home to conduct a regular home visit. As Ms. Dekarske was departing at the conclusion of the visit, Jane ran from the house and told Ms. Dekarske, "I just want to let you know I am recanting my story and I'm making it all up." Ms. Dekarske described Jane's recantation as "very robotic and boxed in" and stated that her comments appeared to have "been rehearsed for her to say."

On 7 August 2013, Jane called Detective Doremus while defendant listened on a separate line. According to Detective Doremus, it sounded as if two people were already talking when he answered the phone. Almost immediately, Jane stated, "I wish to recant my story." On 21 August 2013, Jane sent an e-mail to Detective Doremus that defendant had helped her to compose in which she recanted her accusations against Mr. Ditenhafer. As a result of this e-mail exchange, Detective Doremus set up a meeting with Jane.

On 29 August 2013, Mr. Doremus met with Jane at her school in an attempt to avoid any interruptions by or confrontations with defendant. At that meeting, Jane told Detective Doremus, "I can't talk to you. I need to call my mom. . . . I'm not talking

to you." Jane then called defendant and told her about the meeting. Defendant later told Jane that she was proud of Jane for not saying anything to Detective Doremus.

As a result of Jane's recantation and various other factors, including defendant's desire for family reunification, Detective Doremus elected to refrain from charging Mr. Ditenhafer with committing any criminal offenses against Jane and Ms. Dekarske closed her child protective services investigation. Around Thanksgiving of 2013, Mr. Ditenhafer moved back into the family home.

Within a week after reentering the family home, Mr. Ditenhafer began sexually abusing Jane again. Jane did not tell defendant about Mr. Ditenhafer's actions because she did not think that defendant would believe her. On 5 February 2014, Jane stayed home from school due to illness even though that meant that she would be alone in the house with Mr. Ditenhafer. On that date, Mr. Ditenhafer forced Jane to straddle him while he inserted his penis into her vagina; defendant entered the bedroom and saw what was happening. Defendant was upset and asked if this was Jane's "first time." Mr. Ditenhafer instructed Jane to tell defendant about her boyfriend. Jane told defendant that she and her boyfriend had previously had sexual intercourse. Jane thought defendant was more upset with her for having had sex with her boyfriend than she was about what she had witnessed Mr. Ditenhafer doing to Jane.

Later that day, on the way to retrieve Jane's cell phone from Detective Doremus, Jane told defendant, "What I said last year about the abuse is true . . . he

has been abusing me, and that wasn't willingly. Sorry." Defendant replied, "I'm not sure if I believe you or not . . . I need to handle this first." Although defendant obtained Jane's phone from Detective Doremus, she did not inform Detective Doremus about the sexual abuse that she had just witnessed or otherwise report Mr. Ditenhafer's conduct to any law enforcement officer or child protective services worker. On the contrary, defendant told Jane to refrain from telling anyone about what Mr. Ditenhafer had done to her because "it was family business" and allowed Mr. Ditenhafer to remain in the family home for about a month after the abuse that defendant had witnessed occurred. In addition, defendant told Jane to "go into [defendant's] room, and . . . get the sheets and the pillow and the pillow case from the incident . . . and anything else that he might have used with [her]." Defendant and Jane tossed the items that Jane had retrieved from the bedroom into the backyard "because [they] had a boxer that liked to chew up and play with stuff" and threw "the rest of the stuff . . . away."

In March 2014, defendant told Mr. Ditenhafer's brother, Jay Ditenhafer, that she had walked in on Mr. Ditenhafer while he was having sexual intercourse with Jane and knew of "some pictures that had been passed between them." Although defendant claimed that she had thought about reporting Mr. Ditenhafer's conduct to the proper authorities, she told Jay Ditenhafer that she had decided not to do so because Mr. Ditenhafer and Jane had been separated "and there was no immediate danger[.]" In late April 2014, Jay Ditenhafer disclosed the information that he had

received from defendant to Child Protective Services "because he did not feel that it was right for that to be happening and nothing was done about it."

On 29 April 2014, Robin Seymore, a Child Protective Services assessor with Wake County Human Services, interviewed Jane at her school. As soon as the conversation began, Jane asked if defendant knew that Ms. Seymore was there. Upon being told that defendant did not know that their interview was taking place, Jane immediately asked, "Can I go out and talk to my mom? I want to call my mom first." Although Ms. Seymore allowed Jane to call defendant, defendant did not answer. According to Mr. Seymore, Jane seemed very anxious and kept saying "I want to call my mom. I need to talk to my mom," throughout the interview. When told of the information that Jay Ditenhafer had provided, Jane responded "that's not true, that's not true, none of that is true, none of that happened." Throughout the interview, Jane seemed "very antsy and just wanted [Ms. Seymore] to leave."

After conversing with Jane, Ms. Seymore went directly to John's school to interview him. As Ms. Seymore talked with John, defendant burst into the room, grabbed her son, and said, "Absolutely not. You're not going to talk to him. You are not going to talk to him. This is not happening."

On 30 April 2014, defendant called Ms. Seymore and made arrangements to speak with her at the family home. Even though it was raining heavily, defendant would not allow Ms. Seymore and her supervisor to enter the house and insisted that the conversation take place outside. During the interview, defendant stated that

although Mr. Ditenhafer came to the house on a daily basis to transport John to and from his school, he did not want to be around Jane in order "to avoid any more lies from [her]." Defendant told Ms. Seymore and her supervisor that she did not want them to go to the children's school any longer and that any conversations that they wished to have with the children should occur immediately outside the family home. At that point, in light of the allegations that Jane had made in 2013 and more recently, Wake County Human Services decided that Jane should be removed from the home.

On 1 May 2014, Detective Doremus, accompanied by other law enforcement officers and representatives of Child Protective Services, went to the family home to take Jane into protective custody and place defendant under arrest. Shortly after their arrival, Detective Doremus and those accompanying him observed defendant approach the family home in her vehicle, slow down, turn around in a neighbor's driveway, and depart in the opposite direction. At that point, Detective Doremus got into his vehicle, activated his blue lights, and pulled defendant over.

As Detective Doremus approached the vehicle, in which Jane and John were passengers, defendant closed her vehicle's windows, locked the doors, and began talking on her cell phone. Despite the fact that Detective Doremus asked defendant to step out of the vehicle several times, defendant remained on the phone and did not comply with Detective Doremus's request. When Detective Doremus ordered defendant to get out of the car, defendant told Jane, "Don't say anything. Don't get

out of the car. . . . If they try and take you away . . . don't go. Refuse to go. . . . [L]ower your arms. Run down the street. Just don't go."

Eventually, defendant complied with Detective Doremus's instructions. In return, Detective Doremus allowed defendant to drive herself back to the family home so that Jane could gather her belongings before entering into the custody of Wake County Human Services. Although Jane wanted to take her cell phone and laptop computer with her, defendant told her not to do so.

B. Procedural History

On 20 May 2014, the Wake County grand jury returned bills of indictment charging defendant with accessory after the fact to sexual activity by a substitute parent and felonious obstruction of justice. On 9 September 2014, the Wake County grand jury returned a superseding indictment charging defendant with accessory after the fact to sexual activity by a substitute parent in which the grand jury alleged that, "on or about February 5, 2014, in Wake County, the defendant named above unlawfully, willfully and feloniously did knowingly assist William George Ditenhafer in escaping detection, arrest or punishment by not reporting the incident after he committed the felony of Sexual Activity by a Substitute Parent." On 10 March 2015, the Wake County grand jury returned a superseding indictment charging defendant with two counts of felonious obstruction of justice, the second count of which alleged that, "on or about July 11, 2013 through September 1, 2013, in Wake County, the defendant named above unlawfully, willfully and feloniously obstructed justice with

deceit and intent to defraud and obstruct an investigation into the sexual abuse of a minor to wit: the defendant denied Wake County Sheriff's Department and Child Protective Services access to her daughter, [Jane] (DOB : 11/27/1996), throughout the course of the investigation."

On 1 June 2015, after a trial, a jury returned verdicts convicting defendant as charged. After accepting the jury's verdicts, the trial court entered judgments sentencing defendant to a term of six to seventeen months imprisonment based upon defendant's first conviction for felonious obstruction of justice, a consecutive term of six to seventeen months imprisonment based upon defendant's second conviction for felonious obstruction of justice, and a consecutive term of thirteen to twenty-five months imprisonment based upon defendant's conviction for accessory after the fact to sexual activity by a substitute parent. Defendant appealed to the Court of Appeals.

In the Court of Appeals, defendant argued, among other things,[2] that the trial court had erred by denying her motions to dismiss the charges for insufficiency of the evidence. *State v. Ditenhafer*, 812 S.E.2d 896, 903 (N.C. Ct. App. 2018). First, the Court of Appeals held that the trial court properly refused to dismiss the first count of felonious obstruction of justice based on an allegation that defendant had pressured

---

[2] In addition to the issues discussed in the text of this opinion, defendant argued that the trial court had erred by failing to instruct the jury that it could only convict defendant for accessory after the fact to sexual activity by a substitute parent on the basis of her alleged failure to report the abuse that had been inflicted upon Jane. As a result of its decision to reverse defendant's accessory after the fact conviction for insufficiency of the evidence, the Court of Appeals did not reach this aspect of defendant's challenges to the trial court's judgments.

Jane to recant.[3] *Id.* at 904. Second, the Court of Appeals held that the trial court erred by denying defendant's motion to dismiss the felonious obstruction of justice charge based on the alleged denial of access to Jane. The Court of Appeals found error in that the State had "presented no evidence of a specific instance in which Defendant expressly denied a request by [the Wake County Sheriff's Department] or [Child Protective Services] to interview the daughter," that an attempt to distinguish between "access" and "full access" would "create an unworkable distinction in our jurisprudence," and that the conviction in question could not be upheld on the basis of other "acts of interference" given that such "conduct was not within the scope of the plain meaning of denying investigators 'access' to the daughter, as alleged in the indictment." *Id.* at 905. Finally, the Court of Appeals held that the trial court erred by denying defendant's motion to dismiss the accessory after the fact charge given that the indictment failed to allege any criminal conduct on the part of defendant, instead alleging "a mere omission," which is "contrary to precedent." *Id.* at 907. The Court of Appeals declined to address whether other "affirmative acts" by defendant supported the accessory after the fact conviction given that "those activities [were] plainly beyond the scope of the charge stated in the indictment." *Id.* at 907. As a result, the Court of Appeals found no error in the entry of the trial court's judgment based upon the first of defendant's felonious obstruction of justice convictions, but

---

[3]As a result of the fact that defendant has not brought this claim forward for our consideration, we need not discuss any further in this opinion the sufficiency of the evidence to support the first of defendant's convictions for felonious obstruction of justice.

reversed the trial court's judgments based upon the second of defendant's felonious obstruction of justice convictions and defendant's accessory after the fact conviction.

Although she agreed with the Court of Appeals majority's decision to overturn the second of defendant's felonious obstruction of justice convictions based on denying investigators access to Jane, the dissenting judge disagreed with the decision to overturn defendant's accessory after the fact conviction based on failure to report the 5 February 2014 incident she observed. According to the dissenting judge, defendant's failure to report constituted an "unlawful omission for the purpose of assisting the perpetrator" that "satisfies the elements of the accessory offense." *Id.* at 908 (Inman, J., concurring in part and dissenting in part). In reaching this result, the dissenting judge relied upon her view that this Court's decision in *State v. Potter* "carved out an exception to" the general rule that neither the withholding of information nor a decision to falsely deny knowledge of a crime "constitutes the unlawful rendering of personal assistance to a felon in and of itself." *Id.* at 908 (citing *State v. Potter*, 221 N.C. 153, 156, 19 S.E.2d 257, 259 (1942)). According to the dissenting judge, "such conduct may rise to the level of personal assistance as an accessory when done 'for the purpose of giving some advantage to the perpetrator of the crime, not on account of fear . . . .' " *Id.* at 908–09 (quoting *Potter,* 221 N.C. at 156, 19 S.E.2d at 259). Because defendant was legally obligated by N.C. Gen. Stat. § 7B-301 to disclose Mr. Ditenhafer's sexual abuse of Jane, defendant could be held criminally liable for failing to report it. *Id.* at 909.

The State appealed to this Court based on the dissenting opinion from that portion of the Court of Appeals' decision that reversed defendant's conviction for accessory after the fact. We allowed the State's petition for discretionary review of the Court of Appeals' decision reversing defendant's second conviction for felonious obstruction of justice by denying investigators access to Jane.

## II. Analysis

### A. Standard of Review

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015) (quoting *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002)). Substantial evidence is the amount "necessary to persuade a rational juror to accept a conclusion." *Id.* (quoting *Mann*, 355 N.C. at 301, 560 S.E.2d at 781). In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered "in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)). In other words, if the record developed in the trial court contains "substantial evidence, whether direct or circumstantial, or a combination, 'to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.'" *Id.* at 575, 780 S.E.2d at 826

(quoting *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988)). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018) (quoting *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016)).

B. <u>Accessory After the Fact</u>

We affirm the Court of Appeals' holding reversing defendant's conviction as an accessory after the fact because: the indictment alleged that she did not report Mr. Ditenhafer's sexual abuse of Jane, a mere failure to report is not sufficient to make someone an accessory after the fact under North Carolina law, and we decline to consider any of defendant's other acts not alleged in this indictment.

The elements necessary to prove someone is an accessory after the fact are: "(1) a felony was committed; (2) the accused knew that the person [s]he received, relieved or assisted was the person who committed the felony; and (3) the accused rendered assistance to the felon personally." *State v. Earnhardt*, 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982) (citing *State v. Squire*, 292 N.C. 494, 505, 234 S.E.2d 563, 569 (1977); *Potter*, 221 N.C. at 156, 19 S.E.2d at 259).

Regarding the rendering assistance element, our decision in *Potter* announced two rules that are pertinent here. First, this court pointed out that an individual *cannot* be held to be an accessory after the fact when she, "knowing that a crime has been committed, *merely fails to give information thereof . . . .*" *Potter*, 221 N.C. at 156,

19 S.E.2d at 259 (emphasis added) (quoting 14 Am. Jur. *Criminal Law* § 103 (1938). Second, the court in *Potter* provided that an individual *can* be held to be an accessory after the fact when she *"conceal[s] . . .* knowledge of the fact that a crime has been committed, *or [gives] false testimony as to the facts . . . ." Id* (emphasis added). The key distinction is between the individual's actions and omissions. Under *Potter*, an individual can be held to be an accessory after the fact only for her actions (such as concealment or giving false testimony), not for her omissions (like failure to report).

Here, defendant's superseding indictment only alleged that she became an accessory after the fact "by not reporting the incident . . . ." But as *Potter* made clear, the mere failure to give information of a crime she knows occurred is legally insufficient to establish the crime of accessory after the fact.

The dissent relies on *State v. Walden*, 306 N.C. 466, 293 S.E.2d 780 (1982), to find that a parent's failure to report would violate her affirmative duty to "take all steps reasonably possible to protect the child from an attack by another person . . . ." 306 N.C. at 475–76, 293 S.E.2d at 786–87. The dissent would hold that, "in the event that a parent fails to report the commission of a crime against his or her child . . . because he or she intends to provide a specific personal benefit to herself, he or she can be held criminally liable as an accessory after the fact to the commission of a criminal offense by another person." This interpretation is a significant departure from *Walden*, where the defendant was prosecuted as a principal for the substantive offense of assault—that is, for the physical harm done to her child as a direct result

of her failure to comply with her duty to protect her child from physical harm. Here, defendant was prosecuted as an accessory, not for the physical or emotional harm to her child, but for "assist[ing] William George Ditenhafer in escaping detection, arrest or punishment by not reporting the incident."

Further, assuming without deciding that some of defendant's other actions in this case may have amounted to "concealment" within the meaning of *Potter* such that defendant *could* have been charged as an accessory after the fact, we are unable to uphold her conviction on that basis because the State did not allege in the indictment that defendant committed any act other than failing to report a specific offense on or about a specific date, 5 February 2014. *See State v. Brown*, 312 N.C. 237, 248, 321 S.E.2d 856, 863 (1984) ("This Court has consistently held that it is error, generally prejudicial, for the trial judge to permit a jury to convict upon a theory not supported by the bill of indictment." (citing *State v. Taylor*, 301 N.C. 164, 170, 270 S.E.2d 409, 413 (1980); *State v. Dammons*, 293 N.C. 263, 272, 237 S.E.2d 834, 840–41 (1977))).

Accordingly, we affirm the decision of the Court of Appeals and hold that the trial court erred by failing to dismiss the charge that defendant was an accessory after the fact by failing to report Mr. Ditenhafer's sexual abuse of Jane.

C. Felonious Obstruction of Justice

Because we conclude that the record—when taken in the light most favorable to the State—contains sufficient evidence to support defendant's conviction for

felonious obstruction of justice based upon a denial of access to Jane, we reverse the Court of Appeals on this issue.

"At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) (quoting 67 C.J.S. *Obstructing Justice* § 2 (1978)). If common law obstruction of justice is done "with deceit and intent to defraud" it is a felony. N.C.G.S. § 14-3(b) (2017); *see also State v. Cousin*, 233 N.C. App. 523, 537, 757 S.E.2d 332, 342–43 (2014) ("The elements of common law felonious obstruction of justice are: (1) the defendant unlawfully and willfully; (2) obstructed justice; (3) with deceit and intent to defraud.")

Here, the record contains evidence tending to show that defendant talked over Jane during several interviews conducted by investigating officers and social workers in such a manner that Jane was precluded from answering the questions that were posed to her. Defendant told investigating officers and social workers that Jane had made false accusations against Mr. Ditenhafer. Defendant interrupted an interview, during which investigating officers and social workers were attempting to obtain information from Jane concerning the sexual abuse that she had experienced at the hands of Mr. Ditenhafer, by constantly sending Jane text messages and by abruptly removing Jane from the interview when she realized that Jane was not recanting her allegations. Defendant induced Jane to call Detective Doremus for the purpose of recanting her allegations against Mr. Ditenhafer and listened on the other telephone

line while Jane did so. Similarly, defendant composed an e-mail that Jane sent to Detective Doremus in which she recanted her accusations. Defendant successfully induced Jane to refuse to speak with investigating officers and social workers, as evidenced by Jane's statement to Detective Doremus that "I can't talk to you. I need to call my mom," and her statement to Ms. Seymore that "I want to call my mom. I need to talk to my mom." Defendant insisted that Ms. Seymore interview Jane outside in the middle of a rainstorm by refusing to allow the interview to take place in the family home, insisted that Ms. Seymore refrain from speaking to Jane at her school, and demanded that all interviews with any family members be conducted outside the family home. On 1 May 2014, defendant fled from Detective Doremus with Jane and John, refused to unlock the doors of her automobile after Detective Doremus stopped it, and told Jane, "Don't say anything. Don't get out of the car. . . . If they try and take you away . . . don't go. Refuse to go. . . . [L]ower your arms. Run down the street. Just don't go."

After giving "every reasonable intendment" and making "every reasonable inference" from the evidence in favor of the State, *Winkler*, 368 N.C. at 574, 780 S.E.2d at 826, we conclude that the evidence here was sufficient "to persuade a rational juror" that defendant denied officers and social workers access to Jane throughout their investigation into Jane's allegations against Mr. Ditenhafer. *Id.* As a result, we reverse the Court of Appeals' holding that the evidence did not support

defendant's conviction for felonious obstruction of justice based upon defendant's actions in denying access to Jane.

### III. Conclusion

For the reasons set forth above, we affirm the Court of Appeals' decision to the extent that it held that the trial court erred by denying defendant's motion to dismiss the charge of accessory after the fact to sexual activity by a substitute parent. However, we reverse the Court of Appeals' decision to the extent that it held that the trial court erred by denying defendant's motion to dismiss the second of the two felonious obstruction of justice charges (denial of access to Jane), as set out in the superseding indictment. As a result, the Court of Appeals' decision is affirmed in part, reversed in part, and this case is remanded to that court to determine whether there is sufficient evidence to enhance the charge of obstruction of justice for denying access to Jane from a misdemeanor to a felony under N.C.G.S. § 14-3(b).[4]

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

---

[4] This issue was raised in the Court of Appeals, but was not reached because that court found there was insufficient evidence to support defendant's conviction for obstruction of justice based on defendant's actions in denying access to Jane.

Justice ERVIN concurring in part and dissenting in part.

Although I concur in the Court's determination that the record contains sufficient evidence, when taken in the light most favorable to the State, to support defendant's conviction for felonious obstruction of justice based upon a denial of access to Jane, I am unable to concur in its determination that the record fails to contain sufficient evidence to support defendant's conviction for accessory after the fact to sexual activity by a substitute parent. Instead, I believe that the trial court correctly denied defendant's motions to dismiss both of these charges for insufficiency of the evidence. As a result, I concur in the Court's opinion, in part, and dissent from its opinion, in part.

The elements of the crime of accessory after the fact are that: "(1) a felony was committed; (2) the accused knew that the person [s]he received, relieved or assisted was the person who committed the felony; and (3) the accused rendered assistance to the felon personally." *State v. Earnhardt*, 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982) (first citing *State v. Squire*, 292 N.C. 494, 505, 234 S.E.2d 563, 569 (1977); and then citing *State v. Potter*, 221 N.C. 153, 156, 19 S.E.2d 257, 259 (1942)).

> [T]o be an accessory after the fact one need only aid the criminal to escape arrest and prosecution. It is said that "this rule, however, does not render one an accessory after the fact who, knowing that a crime has been committed, merely fails to give information thereof, nor will the act of a person having knowledge of facts concerning the commission of an offense in falsifying concerning his knowledge ordinarily render him an accessory after the fact. Where, however, the concealment of knowledge of the

> fact that a crime has been committed, or the giving of false
> testimony as to the facts is made for the purpose of giving
> some advantage to the perpetrator of the crime, not on
> account of fear, and for the fact of the advantage to the
> accused, the person rendering such aid is an accessory after
> the fact."

*Potter*, 221 N.C. at 156, 19 S.E.2d at 259 (quoting 14 Am. Jur. *Criminal Law* § 103, at 837 (1938)). Although the Court of Appeals, consistent with the result that the Court has reached in this case, determined that *Potter* criminalizes only "active conduct" and that "[m]erely concealing knowledge regarding the commission of a crime or falsifying such knowledge does not cause a person to become an accessory after the fact," *State v. Ditenhafer*, 812 S.E.2d 896, 906 (2018) (quoting *State v. Hicks*, 22 N.C. App. 554, 557, 207 S.E.2d 318, 320 *cert. denied*, 285 N.C. 761, 209 S.E.2d 286 (1974)), this analysis overlooks our subsequent statement that, "[w]here . . . the concealment of knowledge of the fact that a crime has been committed, or the giving of false testimony as to the facts is made for the purpose of giving some advantage to the perpetrator of the crime, not on account of fear, and for the fact of the advantage to the accused, the person rendering such aid is an accessory after the fact," *Potter*, 221 N.C. at 156, 19 S.E.2d at 259. Thus, while *Potter* does state that "merely fail[ing] to give information" is not sufficient to make one an accessory after the fact to the criminal conduct of another, it also clearly indicates that such liability can be based upon defendant's "concealment of knowledge . . . for the purpose of giving some advantage to the perpetrator of the crime, not on account of fear, and for the fact of

the advantage to the accused."[1]  *Id.* at 156, 19 S.E.2d at 259.  As the Court of Appeals

has acknowledged, the basic principle enunciated in *Potter* "is applicable to situations

where a person *merely fails to give information* of the committed felony or *denies*

*knowledge* of the committed felony," with this limitation "made clear by the sentence

in the text which immediately precedes the one quoted."  *State v. Martin*, 30 N.C.

App. 166, 170, 226 S.E.2d 682, 684 (1976).[2]

Consistently with this interpretation of *Potter*, this Court has recognized that,

in certain instances, individuals can be held criminally liable for failing to take

appropriate action to prevent the commission of unlawful conduct under certain

circumstances.  In *State v. Walden*, 306 N.C. 466, 476, 293 S.E.2d 780, 786–87 (1982),

we upheld a defendant's conviction for felonious assault on an aiding and abetting

theory based upon evidence tending to show that the defendant had failed to take

action to prevent another person from assaulting and seriously injuring her child

---

[1] The Court appears to read *Potter's* reference to the "concealment of knowledge" to be limited to affirmative acts committed by a defendant for the purpose of precluding the discovery of the principal's unlawful conduct.  *Potter*, 221 N.C. at 156, 19 S.E.2d at 259. However, I believe that the juxtaposition of the reference to "merely failing to give information," which seems to encompass simple silence unaccompanied by any other factor, with the reference to "concealment of knowledge," which focuses upon what one knows rather than what one does, suggests that finding a defendant guilty of accessory after the fact, based upon a failure to disclose and accompanied by the necessary mental state would be appropriate.  *Id.*

[2] Although the Court of Appeals suggested in *Martin*, 30 N.C App. at 170, 226 S.E.2d at 684, that the language quoted in the text is dicta, the relevant language from *Potter*, taken in its entirety, strikes me as a statement of the general principles upon which the Court relied in determining that the evidence was sufficient to support the defendant's conviction in that case.

given that parents have an affirmative duty to protect their children from harm. In reaching this result, we recognized that "to require a parent as a matter of law to take affirmative action to prevent harm to his or her child or be held criminally liable imposes a reasonable duty upon the parent"; that "this duty is and has always been inherent in the duty of parents to provide for the safety and welfare of their children, which duty has long been recognized by the common law and by statute"; and that "the failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed." *Id.* at 475–76, 293 S.E.2d at 786–87 (first citing N.C.G.S. § 14-316.1; then citing *In re TenHooten*, 202 N.C. 223, 162 S.E. 619 (1932); and then citing *State v Haywood*, 295 N.C. 709, 249 S.E.2d 429 (1978)).

I recognize the risks that are associated with criminalizing omissions, such as the failure to report the commission of a criminal offense. However, the existing decisional law in this jurisdiction clearly contemplates such a result in a limited number of instances. At an absolute minimum, I are satisfied, after reading *Potter* and *Walden* in conjunction with each other, that, in the event that a parent fails to report the commission of a crime against his or her child to the proper authorities when the making of such a report is necessary in order to prevent future harm to the child and the parent fails to do so because he or she intends to provide a specific

personal benefit to the perpetrator and to herself, he or she can be held criminally liable as an accessory after the fact to the commission of a criminal offense by another person.

As the record in this case clearly reflects, defendant caught Mr. Ditenhafer in the act of committing a serious sexual assault upon Jane. As of that point in time, defendant had no reasonable basis for doubting that Mr. Ditenhafer had engaged in a lengthy pattern of sexually abusing Jane, had direct knowledge that Mr. Ditenhafer had continued to sexually abuse Jane despite the disruption and risk that had been created by Jane's earlier accusations, and had every reason to believe that Mr. Ditenhafer's misconduct would continue unless defendant took affirmative action to bring it to an end. In addition, defendant had a clear legal obligation to protect her child, Jane, from future harm. The only way that defendant could have assured that Mr. Ditenhafer did not continue to sexually assault Jane would have been to report his conduct to the proper authorities, a step that defendant simply refused to take. As a result, defendant clearly had an obligation to report Mr. Ditenhafer's conduct to the proper authorities in order to comply with her legal duty to protect Jane from further harm and failed to do so.

In addition, a careful review of the evidence contained in the record developed at trial, when taken in the light most favorable to the State, clearly permits a determination that defendant acted for the purpose of providing a specific advantage

to both Mr. Ditenhafer and herself.[3] For example, the State presented evidence tending to show that defendant pressured Jane to recant the allegations that she had made against Mr. Ditenhafer by telling her that "[Mr. Ditenhafer] was going to go to jail because of [her] lies." In addition, defendant told Jane to refrain from reporting the abuse to which she had been subjected at the hands of Mr. Ditenhafer because "it was family business." Defendant told Jay Ditenhafer not to involve authorities and informed investigators that Jane's allegations were not true. Finally, even after catching Mr. Ditenhafer in the act of sexually abusing Jane, defendant participated in the destruction of the bed linens that might tend to evidence the abuse to which Jane had been subjected. As the dissenting judge in the Court of Appeals correctly noted, "the evidence of additional acts committed by [d]efendant . . . support[ed] a reasonable inference that her failure to report the abuse to law enforcement was for the purpose of helping her husband escape prosecution." *Ditenhafer*, 812 S.E.2d at 909–10 (Inman, J., concurring, in part. and dissenting, in part).

---

[3] I do not believe that the use of acts other than those specified in the relevant count of the indictment for the purpose of shedding light on the intent with which and the purpose for which defendant failed to act in any way runs counter to the prohibition against allowing a defendant to be convicted upon the basis of a legal theory not alleged in the underlying criminal pleading. This issue typically arises only when the criminal offense in question is statutorily defined in such a manner that the defendant can be convicted on the basis of multiple legal theories, such as is the case with the offense of first-degree kidnaping. *See State v. Brown*, 312 N.C. 237, 247–48, 321 S.E.2d 856, 862–63 (1984) (holding that the trial court erred by allowing the defendant to be convicted of first-degree kidnaping in the event that the defendant acted "for the purpose of terrorizing" the victim even though the indictment alleged that the defendant acted "for the purpose of facilitating the commission of a felony, to wit: attempted rape").

Similarly, the State presented ample evidence tending to show that defendant's failure to report the abuse that Jane had suffered at the hands of Mr. Ditenhafer was intended to provide a specific and direct benefit to defendant. Among other things, defendant stated that the investigation was "tear[ing] apart the family" and that a continued investigation "would cost them more money and time." Similarly, defendant told Jane that, if she did not recant her allegations against Mr. Ditenhafer, the family would "lose [their] money" and "lose their stuff and the animals." Finally, defendant told Jane that she needed to recant the allegations that she had made against Mr. Ditenhafer in order to alleviate the stress that defendant was experiencing and that this stress was exacerbating her possible breast cancer. Thus, the record contains ample evidence tending to show that defendant refrained from reporting the sexual abuse to which Jane had been subjected for defendant's own benefit as well. Based upon this logic, I believe that the Court of Appeals erred by holding that the record did not contain sufficient evidence to support defendant's accessory after the fact conviction and dissent from the Court's conclusion to the contrary, although I join in the remainder of its opinion. As a result, I concur in the Court's decision, in part, and dissent from its decision, in part.

Justice NEWBY joins in this separate opinion.