IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-19

No. 126A18-2

Filed 12 March 2021

STATE OF NORTH CAROLINA

v.

MARDI JEAN DITENHAFER

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 840 S.E.2d 850 (N.C. Ct. App. 2020), finding no error in a judgment entered on 1 June 2015 by Judge Paul G. Gessner in Superior Court, Wake County. Heard in the Supreme Court on 11 January 2021.

*Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Special Deputy Attorney General, for the State-appellee.*

*Jarvis John Edgerton, IV, for defendant-appellant.*

ERVIN, Justice.

¶ 1 The issue before us in this case involves the sufficiency of the evidence to support defendant Mardi Jean Ditenhafer's conviction for felonious obstruction of justice based upon her actions in allegedly interfering with the ability of law enforcement officers and social workers to have access to her daughter, who had been sexually abused by defendant's husband. After careful consideration of defendant's challenge to the Court of Appeals' decision, we hold that the record contains sufficient evidence that defendant acted with deceit and intent to defraud to support her

conviction for felonious obstruction of justice and affirm the decision of the Court of Appeals.

## I.    Factual Background

### A. Substantive Facts

Defendant is the mother of Jane and the wife of William Ditenhafer, who is Jane's adopted father.[1]  After reaching middle school, Jane developed mental health and self-esteem-related problems and began to engage in self-harming-related activities.  According to Jane, defendant would become angry about her self-harming activities, claiming that she was acting as she was in order to get "attention" and to "fit in" and that Jane needed to stop what she was doing.  Jane claimed to be afraid of Mr. Ditenhafer because of his anger, his tendency to yell at her, and the spankings that he would administer for the purpose of disciplining her when she got in trouble.  Upon discovering that Jane had sent suggestive photos of herself to a middle school boy, defendant and Mr. Ditenhafer became very angry with Jane and prohibited her from using electronic devices.  Around the same time, Mr. Ditenhafer, with defendant's knowledge, began giving Jane full-body massages to "help [her] self-esteem."

---

[1] "Jane" and "John" are pseudonyms that are employed in order to protect the children's identities and for ease of reading.

¶ 3        After giving Jane a massage in 2013, Mr. Ditenhafer told Jane to come into the living room.  Once she had complied with that instruction, Mr. Ditenhafer informed Jane that he had discovered that she had sent additional suggestive photographs to the boy who had received the earlier images.  According to Jane, Mr. Ditenhafer claimed to have been "turned on" by these photos and told Jane that they "could either show [defendant] these photos" or she could "help him with his . . . boner."  At that point, Jane started crying because, "if [defendant] saw these [images] again, she would call the police and I would get in trouble and I would get sent to jail," and did as Mr. Ditenhafer had instructed her to do.

¶ 4        Subsequently, Mr. Ditenhafer began to pressure Jane to engage in sexual acts with him on a regular basis.  Over time, the abuse that Mr. Ditenhafer inflicted upon Jane became more serious, with such abusive episodes occurring "at least two times a week" when defendant was not in the home and progressing to the point that Mr. Ditenhafer had Jane engage in oral and vaginal sex acts with him.  Jane claimed that Mr. Ditenhafer told her not to tell anyone about the abuse or he would make her sound like a "crazy lying teenager."  Jane refrained from telling defendant about the abuse that she was suffering at the hands of her adoptive father because she "didn't think [defendant] would believe [her] and [defendant] would get angry at [her] for making up a lie."

¶ 5        In the spring of 2013, when Jane was in the ninth grade, she visited an aunt, who was the sister of her biological father, in Arizona. During that visit, Jane informed her aunt that Mr. Ditenhafer had been sexually abusing her. At that point, Jane and her aunt called defendant for the purpose of telling defendant about the abuse that Jane had experienced. Defendant reacted to the information that Jane and her aunt had provided by becoming angry with Jane.

¶ 6        The aunt reported Jane's accusations against Mr. Ditenhafer to law enforcement officers in Arizona. The Arizona officers, in turn, contacted Detective Stan Doremus of the Wake County Sheriff's Office, who initiated an investigation into Jane's allegations. Jane testified that, upon her return to North Carolina, defendant picked her up from the airport and told her that defendant did not believe Jane's accusations; that Jane "needed to tell the truth and recant and not — and not lie anymore because it was going to tear apart the family and it was just going to end horribly"; and "that [Jane] didn't need to do this."

¶ 7        After learning of Jane's accusations against Mr. Ditenhafer, Susan Dekarske, a social worker employed by the Child Protective Services Department of Wake County Human Services, interviewed defendant and Mr. Ditenhafer, both of whom denied Jane's accusations. Even so, Mr. Ditenhafter agreed to move out of the family home and to refrain from communicating with Jane during the pendency of the investigation.

On 11 April 2013 Jane and defendant met with Detective Doremus and Ms. Dekarske at the family home. After Ms. Dekarske asked to speak with her privately, Jane told Ms. Dekarske about several instances of sexual abuse that she had suffered at the hands of Mr. Ditenhafer, the fact that defendant urged Jane to recant her accusations against her adoptive father, and the fact that defendant had blamed Jane for destroying the family given that Mr. Ditenhafer "would get 15 years in prison, that [defendant] would also lose her job and that [John] would lose his dad, [and] they will lose the house." On 22 May 2013, Detective Doremus and Ms. Dekarske went to Jane's school for the purpose of speaking with her privately in light of their understanding that defendant had been pressuring Jane to deny the truthfulness of her claims against Mr. Ditenhafer.

On 21 June 2013, Detective Doremus and Ms. Dekarske again met with defendant and Jane at the family home. During the course of this meeting, defendant "had her hand on [Jane]'s thigh virtually the whole time" and "was answering the questions for [Jane]." When Detective Doremus asked defendant whether she thought that Jane's accusations against Mr. Ditenhafer were true, defendant, who appeared to be shocked, responded by stating that "there is some truth to everything that [Jane] says but not all of it is true." In addition, defendant told Ms. Dekarske that she and Jane had been working to improve their ability to communicate with each other and that, while defendant believed a portion of what Jane had been saying,

she "did not believe it was" Mr. Ditenhafer who had abused Jane. After Detective Doremus and Ms. Dekarske asked if they could speak with Jane privately, defendant responded that she was not comfortable with allowing Jane to be alone with Detective Doremus and declined to allow this request.

¶ 10 Detective Doremus and Ms. Dekarske met with Jane in private again on 11 July 2013. Detective Doremus recalled that, as soon as she entered the meeting room, Jane "became upset and said that the only reason that [defendant] let her talk with us alone is because [Jane was] supposed to recant" and that, upon making this statement, Jane "started to cry, [and] said she was not going to recant to us because she was telling the truth." As the meeting progressed, defendant sent text messages to Jane asking how the meeting was going, interrupted the meeting by entering the room in which the interview was taking place, and appeared angry when Detective Doremus informed her that Jane had not recanted her accusations against her adoptive father. After Detective Doremus showed defendant a stack of sexually explicit e-mails that Mr. Ditenhafer had sent to Jane, defendant "looked at one page [of the e-mails], . . . flipped over to another page, and then left" with Jane in a "[h]urried, angry, rushed" manner.

¶ 11 As the investigation continued, defendant remained angry with Jane and continued to pressure her to recant. At one point, defendant threatened to take Jane to a psychiatric hospital because Jane was "crazy." When asked about the nature of

the comments that defendant had made to her during this period of time, Jane

testified that

> [defendant] would tell me I was manipulative and crazy
> and how I needed to tell the truth because I was tearing
> apart her family and destroying her family and that [Mr.
> Ditenhafer] was going to go to jail because of my lies and
> [my younger brother] was going to turn into a drug addict
> and drop out of high school and that I was, like, ruining,
> like, our family.  And this one time she also called me a
> manipulative bitch.

In addition, defendant forbade Jane from visiting or talking with her Arizona

relatives until she told them that she had falsely accused Mr. Ditenhafer of sexually

abusing her.  Defendant also informed Jane that a family trip to Disneyland was "not

going to happen because we're going to lose our money and we're going to lose our

stuff and the animals" and that, on the other hand, if Jane recanted her allegations

against Mr. Ditenhafer, the family could still go to Disneyland.  Finally, defendant

told Jane that defendant might have breast cancer and that Jane needed to stop lying

about the way in which her adoptive father had treated her because those lies were

causing defendant to experience stress.

¶ 12    The conduct in which defendant engaged and Jane's fear that she would lose

her relationship with her younger brother finally caused Jane to recant her

accusations against Mr. Ditenhafer in early August 2013.  On 5 August 2013, as Ms.

Dekarske was preparing to leave after meeting with Jane and defendant at the family

home, Jane ran outside and told Ms. Dekarske that she needed to tell her something.

Then, in a manner that Ms. Dekarske described as "robotic" and "rehearsed," Jane stated, "I just want to let you know I am recanting my story and I'm making it all up." As Ms. Dekarske looked back towards the house, she saw defendant watching from the window, so she decided to end the conversation and discuss the subject with Jane at a later time.

¶ 13 On 7 August 2013, Jane called Detective Doremus and told him, while defendant listened, that she wished to recant her accusations against Mr. Ditenhafer. In addition, Jane sent an e-mail to Detective Doremus for the purpose of telling him that she wished to recant, with defendant having "prompted [Jane] on what to write."

¶ 14 On 29 August 2013, Detective Doremus went to Jane's school for the purpose of meeting with Jane. As she entered the room in which the meeting was to take place, Jane appeared to be nervous and told Detective Doremus that "I'm not supposed to talk to you." In response, Detective Doremus informed Jane that, while he believed that her allegations against her adoptive father were true, the Wake County Sheriff's Office had ended its investigation and Mr. Ditenhafer would not be prosecuted for sexually abusing her.

¶ 15 Mr. Ditenhafer moved back into the family home around Thanksgiving and resumed his practice of sexually abusing Jane while defendant was absent from the house. On 5 February 2014, defendant entered the bedroom that she shared with Mr. Ditenhafter and observed Mr. Ditenhafer engaging in vaginal intercourse with Jane.

As Jane retreated into the adjacent bathroom, defendant angrily yelled "What's going on? What is this?" While Jane stood crying in the bathroom, defendant asked Jane whether this was her "first time." Although Jane contemplated telling defendant that Mr. Ditenhafer had habitually abused her for the past several years, she told defendant instead that "my boyfriend and I have done it before."

¶ 16    Later that day, defendant drove Jane to a McDonald's at which defendant planned to retrieve a cell phone that Detective Doremus had examined during the investigation of Jane's earlier accusations against Mr. Ditenhafer. At that time, Jane told defendant that she had been telling the truth about Mr. Ditenhafer's conduct and that he had continued to sexually abuse her. In response, defendant stated that "I'm not sure if I believe you or not, but I just—I need to handle this first" before exiting the vehicle to obtain the cell phone from Detective Doremus. Defendant did not report what she had witnessed to Detective Doremus and refused to allow Jane to speak with him. In addition, defendant directed Jane to refrain from telling anyone else about what Mr. Ditenhafer had been doing to her "[b]ecause it was family business" and instructed Jane to help her discard the sheets and bedding upon which the abuse had occurred.

¶ 17    On 16 March 2014, defendant called Mr. Ditenhafer's brother and told him that she had walked in upon an act of sexual abuse involving Mr. Ditenhafer and Jane. After receiving this information, which he found to be shocking, the brother-in-law

continued to communicate with defendant over the course of the next several weeks for the purpose of helping defendant determine how she should protect herself and the children. Although the brother-in-law initially thought that defendant would act in the children's best interest, she informed him a few weeks after their initial conversation that she intended to refrain from "involv[ing] anyone else or the authorities because that would cost them more money and time" and because "[w]e don't need anymore [sic] drama." At this point, the brother-in-law notified Child Protective Services about the sexual abuse that Mr. Ditenhafer had perpetrated upon Jane, resulting in the initiation of a new investigation by that agency.

¶ 18    On 29 April 2014, Robin Seymore, a Wake County Human Services employee, went to Jane's school for the purpose of interviewing Jane. Jane appeared anxious during her conversation with Ms. Seymore, denied that Mr. Ditenhafer had ever abused her, and called defendant to let her know that Ms. Seymore was there asking questions. After the end of her conversation with Jane, Ms. Seymore went to John's school in order to interview him. Within five minutes after Ms. Seymore's discussion with John had begun, defendant burst into the room in which the interview was being conducted, grabbed John, and told Ms. Seymore, "[a]bsolutely not. You're not going to talk to him. You are not going to talk to him. This is not happening." After making this series of statements, defendant told Ms. Seymore that "I have nothing to say to you" before leaving the interview room with John.

¶ 19        On 30 April 2014, Ms. Seymore went to the family home for the purpose of interviewing defendant. In spite of the fact that rain was pouring down and thunder could be heard, defendant told Ms. Seymore, "[y]ou're not coming into the house" and insisted that they talk outside. In the course of the ensuing conversation, defendant stated that Mr. Ditenhafer had stopped living in the family home during the preceding February while insisting that his departure "had nothing to do with the children or [Jane]" and suggested that his absence stemmed from the fact that "they had marital problems." In addition, defendant stated that her husband had decided to refrain from entering the house anymore in order to "avoid any more lies from [Jane]." After Ms. Seymore left the family home following her conversation with defendant, she and her supervisor decided to seek the entry of an order taking Jane into the nonsecure custody of Wake County Human Services.

¶ 20        On 1 May 2014, Detective Doremus and other law enforcement officers came to the family home for the purpose of placing defendant under arrest and taking Jane into the custody of the Wake County Department of Human Services. After their arrival, the officers observed defendant driving towards the residence. Upon discovering that Detective Doremus and the other officers were present, defendant backed up, turned around, and began to drive away. After the officers followed defendant and activated their emergency lights, defendant, who had Jane and John in the vehicle with her, pulled over on the side of the road, rolled up the windows,

locked the doors, and phoned her attorney while ignoring the officers' requests that she exit from her vehicle. As she sat in the car with the children, defendant told Jane, "[d]on't say anything. Don't get out of the car . . . If they try and take you away, [Jane], don't go. Refuse to go. . . . Run down the street. Just don't go." Eventually, defendant complied with the officers' requests and was placed under arrest.

**B. Procedural History**

On 20 May 2014, the Wake County grand jury returned a bill of indictment charging defendant with one count of felonious obstruction of justice and one count of accessory after the fact to sexual activity by a substitute parent. On 9 September 2014, the Wake County grand jury returned a superseding indictment charging defendant with being an accessory after the fact to sexual activity by a substitute parent based upon an event that allegedly occurred on or about 5 February 2014. On 10 March 2015, the Wake County grand jury returned another superseding indictment charging defendant with two counts of felonious obstruction of justice, with one count alleging that defendant had obstructed justice by encouraging Jane to recant her allegations of sexual abuse against Mr. Ditenhafer on or about the period from 11 July 2013 to 1 September 2013 and with the second count alleging that defendant had obstructed justice by denying employees of the Wake County Sheriff's Office and the Wake County Department of Human Services access to Jane on or about the period from 11 July 2013 to 1 September 2013.

The charges against defendant came on for trial before the trial court and a jury at the 25 May 2015 criminal session of the Superior Court, Wake County. At the close of the State's evidence, defendant, who did not offer evidence on her own behalf, unsuccessfully moved to dismiss all three of the charges that had been lodged against her for insufficiency of the evidence and on the basis of "a variance between the crime alleged in the indictment and any crime for which the State's evidence may have been sufficient to warrant submission to the jury[.]" On 1 June 2015, the jury returned verdicts convicting defendant of felonious obstruction of justice by encouraging Jane to recant the allegations of sexual abuse that she had made against Mr. Ditenhafer, felonious obstruction of justice based upon her actions in denying employees of the Wake County Sheriff's Office and the Wake County Department of Human Services access to Jane, and accessory after the fact to sexual activity by a substitute parent. Based upon the jury's verdicts, the trial court entered a judgment sentencing defendant to a term of six to seventeen months imprisonment based upon the first of her two convictions for felonious obstruction of justice, a judgment sentencing defendant to a consecutive term of six to seventeen months imprisonment based upon her second conviction for felonious obstruction of justice, and a judgment sentencing defendant to a consecutive term of thirteen to twenty-five months imprisonment based upon her conviction for accessory after the fact to sexual activity by a substitute

parent. Defendant noted an appeal to the Court of Appeals from the trial court's judgments.

¶ 23     In seeking relief from the trial court's judgments before the Court of Appeals, defendant argued that the trial court had erred by denying her motions to dismiss all three of the charges that had been lodged against her for insufficiency of the evidence and by "failing to limit Defendant's culpable conduct in its jury instruction for accessory after the fact to her failure to report abuse." *State v. Ditenhafer*, 258 N.C. App. 537, 547 (2018), *aff'd in part and rev'd in part*, 373 N.C. 116 (2019). In a divided decision, the Court of Appeals found no error in the trial court's judgment relating to the first of defendant's obstruction of justice convictions, which rested upon defendant's conduct in encouraging Jane to recant her accusations against Mr. Ditenhafer, on the grounds that the record contained sufficient evidence to support defendant's conviction. *Id.* at 547–49. On the other hand, the Court of Appeals overturned the trial court's judgment relating to the second of defendant's obstruction of justice convictions, which rested upon defendant's conduct in precluding investigating officials from having access to Jane, on the grounds that the record did not contain sufficient evidence to support that conviction. *Id.* at 550–51. Finally, the Court of Appeals reversed the judgment that the trial court had entered based upon defendant's conviction for accessory after the fact to sexual activity by a substitute parent on the grounds the indictment that had been returned against defendant

"fail[e]d to allege any criminal conduct" and, instead, sought to hold defendant liable for an omission unrelated to the performance of any criminal act. *Id.* at 551–53. The State noted an appeal to this Court from the Court of Appeals' decision relating to defendant's conviction for accessory after the fact to sexual activity by a substitute parent based upon a dissenting opinion by Judge Inman and this Court granted the State's request for discretionary review with respect to the issue of whether the record contained sufficient evidence to support defendant's conviction for the felonious obstruction of justice charge relating to defendant's actions in precluding investigating officials from having access to Jane.

¶ 24     On 1 November 2019, this Court filed an opinion in which it affirmed the Court of Appeals' decision to reverse defendant's conviction for accessory after the fact to sexual activity by a substitute parent. *State v. Ditenhafer*, 373 N.C. 116, 129 (2019). In addition, we overturned the Court of Appeals determination that the trial court had erred by denying defendant's motion to dismiss the charge that defendant had feloniously obstructed justice by denying investigating officials access to Jane for insufficiency of the evidence on the grounds that the record contained sufficient evidence "to persuade a rational juror that defendant denied officers and social workers access to Jane." *Id.* at 129 (cleaned up). In support of this conclusion, we pointed to the presence of evidence tending to show that defendant had "talked over Jane during several interviews . . . in such a manner that Jane was precluded from

answering the questions," that defendant had "interrupted an interview . . . by constantly sending Jane text messages and by abruptly removing Jane from the interview," and that defendant "successfully induced Jane to refuse to speak with investigating officers and social workers" on multiple occasions. *Id*. at 128. As a result, we remanded this case to the Court of Appeals for the limited purpose of determining "whether there [was] sufficient evidence to enhance the charge of obstruction of justice for denying access to Jane from a misdemeanor to a felony under N.C.G.S. § 14-3(b)." *Id*. at 129.

¶ 25      On remand from this Court, the Court of Appeals held that there was sufficient record evidence to support defendant's conviction for felonious, as compared to misdemeanor, obstruction of justice on the grounds that defendant had precluded investigating officials from having access to Jane. *State v. Ditenhafer*, 840 S.E.2d 850, 855 (N.C. Ct. App. 2020) (holding that "the State [had] introduced evidence, taken in the light most favorable to it, that [d]efendant acted with deceit and the intent to defraud"). In support of its determination that defendant's actions had involved deceit and the existence of an intent to defraud, the Court of Appeals pointed to the fact that defendant "did not permit [Jane] to answer questions and answered for her in one interview, sent text messages and physically interrupted another interview, and sought to constantly influence [Jane]'s statements in those interviews by verbally abusing and punishing [Jane] for the statements she was making." *Id*. at

856. In addition, the Court of Appeals noted the presence of evidence tending to show that defendant had "instructed [Jane] not to speak with investigators and directed investigators not to speak with [Jane] in private, ensuring that the daughter did not have the opportunity to give investigators truthful statements regarding the abuse" and that "[d]efendant [had] controlled the narrative by coaching [Jane] on what to say, listening on the line when [Jane] recanted her story to Detective Doremus, and prompting [Jane] on what to write in the [e-mail] in which [Jane] recanted her story." *Id*. (cleaned up). In dissenting from the majority's decision, Judge Tyson stated that the presence of deceit and an intent to defraud "is not what the indictment alleges nor what the State's evidence shows" and asserted that, on the contrary, the record evidence demonstrated that "[d]efendant presented her daughter and allowed access every time upon request," with this fact tending to negate any contention that defendant acted with deceit and intent to defraud. *Id*. at 858 (Tyson, J., dissenting). Defendant noted an appeal to this Court from the Court of Appeals' decision based upon Judge Tyson's dissent.

## II.    Substantive Legal Analysis

¶ 26        In seeking to persuade us to overturn the Court of Appeals' decision, defendant argues that the record is devoid of substantial evidence tending to show that she acted with either deceit or the intent to defraud in the course of denying investigating officials access to Jane. According to defendant, the record evidence uniformly

demonstrates that, during the time period set out in the relevant count of the indictment, she did not believe Jane's accusations against Mr. Ditenhafer. In addition, defendant contends that, in light of the fact that she did not believe Jane's accusations against her husband, her attempt to induce Jane to recant her accusations against Mr. Ditenhafer amounted to an effort to persuade Jane to tell the truth "even if [she was] ultimately wrong about what the truth was." In support of this argument, defendant directs our attention to what she describes as the expressions of shock that defendant made when she interrupted Mr. Ditenhafer's abuse of Jane in February 2014. As a result, defendant maintains that her "actions during the relevant period were not intended to deceive; but, instead, were intended to protect [Mr. Ditenhafer] from what [defendant] incorrectly believed was a false accusation."

In seeking to persuade us to refrain from disturbing the Court of Appeals' decision, the State argues that "the Court of Appeals majority properly followed this Court's directive and determined that the State presented sufficient evidence to support defendant's felony obstruction of justice charge for denying access to the minor sexual abuse victim, Jane." After acknowledging defendant's claim that "she believed Jane was abused by someone other than [Mr. Ditenhafer]," the State points out that defendant "inconsistently took many steps to intervene in and frustrate law enforcement and [social services]' investigations into the sexual abuse." In essence,

the State argues that, "[h]ad defendant indeed committed her acts during the investigation as Jane's concerned biological mother free of any intent to deceive or defraud, defendant would have cooperated with any investigation of Jane's reported sexual abuse" while, instead, defendant "did everything other than cooperate with the investigation" in order "to maintain her belief of a happy life with [Mr. Ditenhafer]." The State further argues that "[d]efendant's intent to deceive and defraud is further revealed by her failure to report or even acknowledge the sexual abuse after directly witnessing it firsthand." As a result, the State argues that "[d]efendant's many actions of pressuring Jane to recant during the indictment period and witnessing the sexual abuse firsthand after the indictment period both show defendant's overall mental attitude towards Jane's sexual abuse allegations and defendant's selfish persistent desire to protect [her husband] and what she believed to be her good life" and permitted the jury to infer "her intent . . . from the circumstances and her actions throughout the investigation."

In deciding whether to grant or deny a motion to dismiss for insufficiency of the evidence, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Crockett*, 368 N.C. 717, 720 (2016) (quoting *State v. Hill*, 365 N.C. 273, 275 (2011)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Stone*, 323 N.C. 447,

451 (1988) (quoting *State v. Smith*, 300 N.C. 71, 78–79 (1980)). Put another way, substantial evidence is that which is "necessary to persuade a rational juror to accept a conclusion." *Crockett*, 368 N.C. at 720 (quoting *Hill*, 365 N.C. at 275). In determining whether the record contains sufficient evidence to support the submission of the issue of defendant's guilt of a criminal offense to the jury, the trial court must consider the evidence "in the light most favorable to the State," with the State being "entitled to every reasonable intendment and every reasonable inference to be drawn therefrom," *State v. Powell*, 299 N.C. 95, 99 (1980), and with "contradictions and discrepancies [being] for the jury to resolve" instead of "warrant[ing] dismissal," *State v. Winkler*, 368 N.C. 572, 574 (2015) (quoting *Powell*, 299 N.C. at 99). For that reason, "[t]he evidence need only give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury." *Stone*, 323 N.C. at 452 (citing *State v. Jones*, 303 N.C. 500, 504 (1981)). In view of the fact that determining whether the record contains sufficient evidence to support the defendant's guilt of a criminal offense requires resolution of "a question of law," *Crockett*, 368 N.C. at 720, this Court reviews challenges to the sufficiency of the evidence to support the jury's decision to convict the defendant of committing a crime using a de novo standard of review, *State v. Melton*, 371 N.C. 750, 756 (2018) (citing *State v. Chekanow*, 370 N.C. 488, 492 (2018)).

At the time that this case was initially before the Court, we held, among other things, that the record contained sufficient evidence to support the submission of the issue of defendant's guilt of obstruction of justice based upon an allegation that defendant had denied investigating officials access to Jane to the jury. *Ditenhafer*, 373 N.C. at 128–29. As a result, the sole issue before the Court of Appeals on remand was whether the record contained sufficient evidence to support defendant's guilt of felonious, rather than misdemeanor, obstruction of justice on the basis of N.C.G.S. § 14-3(b), *id.* at 129, which provides that, "[i]f a misdemeanor as to which no specific punishment is prescribed be infamous, done in secrecy and malice, or with deceit and intent to defraud, the offender shall, except where the offense is a conspiracy to commit a misdemeanor, be guilty of a Class H felony," N.C.G.S. § 14-3(b) (2019). As the Court of Appeals has correctly held, a defendant commits felonious, as compared to misdemeanor, obstruction of justice in the event that he or she "(1) unlawfully and willfully (2) obstruct[s] justice by providing false statements to law enforcement officers investigating [a crime] (3) with deceit and intent to defraud." *State v. Cousin*, 233 N.C. App. 523, 531 (2014). After considering the evidence in the light most favorable to the State, as we are required to do in accordance with the applicable standard of review, we hold that the record contains sufficient evidence to support a jury determination that defendant acted with deceit and an intent to defraud when she denied investigating officials access to Jane.

¶ 30        At trial, the State asserted that defendant sought to deprive investigating officials of meaningful access to Jane in order to preclude her from accusing Mr. Ditenhafer of sexually abusing her. In support of this assertion, the State elicited evidence concerning numerous incidents that occurred during the time period specified in the relevant indictment count. For example, the State presented evidence that defendant answered questions for Jane during meetings with investigators in order to preclude Jane from answering the questions that were posed to her in a truthful manner. In addition, defendant told investigating officials that they were not allowed to speak with Jane privately and instructed Jane to recant the truthful accusations that she had made against Mr. Ditenhafer. On one occasion, defendant interrupted a private meeting between Jane and the investigating officials and removed Jane from the meeting. In the same vein, the record contains evidence tending to show that defendant drafted an e-mail which appeared to state that Jane's accusations against defendant were false and required Jane to send that e-mail to investigating officials. As a result, the record contains evidence tending to show that, in addition to simply precluding investigating officials from having access to Jane, defendant actively encouraged Jane to make what everyone now acknowledges to have been false statements exonerating Mr. Ditenhafer from criminal liability for his sexual abuse of Jane.

¶ 31        Admittedly, the mere existence of evidence tending to show the nature of defendant's obstructive activities does not suffice to show that she acted with the deceit and intent to defraud necessary to support her conviction for felonious, as compared to misdemeanor, obstruction of justice. In addition to containing evidence recounting defendant's obstructive activities, the record is also replete with evidence tending to suggest that, instead of being engaged in a disinterested search for the truth, defendant knew that Jane's accusations against her husband were likely to be true and had motives other than a desire for truthfulness in seeking to interfere with the investigation into the validity of Jane's accusations against Mr. Ditenhafer. For example, during an early stage in the investigation, defendant acknowledged to investigating officials that Jane had probably been abused and that some, but not all, of Jane's accusations were truthful. In light of this admission, the jury could reasonably have concluded that defendant did, in fact, know that something had happened to Jane and that her accusations rested upon something more than a mere fabrication. Similarly, defendant's knowledge that Mr. Ditenhafer had begun giving full-body massages to Jane sufficed to put defendant on notice that the nature of the interactions between Jane and her adoptive father, at an absolute minimum, posed a risk of harm to Jane. In addition, defendant continued her obstructive conduct after being shown inappropriate e-mails that Mr. Ditenhafer had sent to Jane. Finally, defendant's repeated statements that Jane's accusations risked the destruction of the

existing family structure and harm to other members of the family provided ample support for a jury finding that defendant's conduct was motivated by a desire to preserve the existing family structure, from which she clearly believed that she derived benefits, rather than an attempt to dissuade Jane from making false accusations against Mr. Ditenhafer.

¶ 32     The inference that defendant was acting with deceit and an intent to defraud that the jury was entitled to draw based upon the evidence of defendant's conduct during the period of time specified in the relevant count of the indictment is substantially bolstered by the evidence concerning defendant's conduct in the aftermath of her discovery in September 2014 that Mr. Ditenhafer was, in fact, sexually abusing Jane.[2]  In spite of the fact that she now had conclusive proof that Jane's accusations against Mr. Ditenhafer were true, defendant continued to attempt to protect her husband from the consequences of his actions.  For example, the record reflects that defendant appeared to be more concerned about issues relating to Jane's chastity than about the impact of Mr. Ditenhafer's abusive conduct upon her daughter.  In addition, defendant destroyed the bedding upon which the sexual abuse had occurred.  On the same day upon which defendant obtained confirmation that

---

[2] Assuming, without deciding, that evidence concerning defendant's conduct outside the time period specified in the relevant count of the indictment is not admissible as substantive evidence of defendant's guilt of obstruction of justice, we see no reason why that conduct is not relevant to the issue of the intent with which defendant acted when she obstructed investigating officials' access to Jane during the relevant time period.

Jane's accusations against Mr. Ditenhafer were true, defendant failed to report the adoptive father's conduct to Detective Doremus during a meeting held for the purpose of retrieving Jane's cell phone and refused to allow Jane to speak with Detective Doremus. After acknowledging the abuse that Mr. Ditenhafer had inflicted upon Jane, defendant told her brother-in-law that she had talked to a lawyer and a therapist and that both of them had advised her to refrain from involving anyone else because "[w]e don't need anymore [sic] drama" and because the making of such a report would "cost them more money and time." Finally, when law enforcement officers came to the family home for the purpose of arresting defendant and taking Jane into nonsecure custody, defendant attempted to escape while instructing Jane to "[r]efuse to go" with the officers and to "[r]un down the street" instead. As a result, the extensive evidence of defendant's efforts to protect Mr. Ditenhafer from the consequences of his actions after her discovery that Jane's accusations of sexual abuse were true coupled with the statements that defendant made to the brother-in-law provides substantial additional support for the State's contention that, rather than simply trying to ensure that investigating officials were not misled by Jane's false accusations against Mr. Ditenhafer, defendant acted with deceit and an intent to defraud.

¶ 33      As a result, for all of these reasons, we hold that the record evidence, when taken in the light most favorable to the State, provides more than sufficient support

for a jury finding that defendant precluded investigating officials from having access to Jane with deceit and the intent to defraud. Although defendant does, of course, take a contrary position and although the record does not contain any evidence tending to show that defendant actually admitted that she had obstructed the State's attempts to investigate Jane's accusations against Mr. Ditenhafer for nefarious reasons, the absence of such direct evidence concerning defendant's mental state does not, of course, preclude the State from attempting to establish defendant's guilt through the use of inferences derived from circumstantial evidence. On the contrary, the presence of evidence tending to show defendant's persistent refusal to acknowledge the truthfulness of Jane's accusations against Mr. Ditenhafer in the face of Jane's assertions that she was telling the truth, defendant's knowledge of what appear to have been inappropriate interactions between Mr. Ditenhafer and Jane, defendant's refusal to credit or even review evidence tending to bolster the credibility of Jane's accusations against Mr. Ditenhafer, and the fact that defendant appears to have been acting on the basis of motives other than a disinterested search for truth during the offense date range specified in the relevant count of the indictment suffices, standing alone, to support a reasonable inference that defendant acted with deceit and an intent to defraud rather than in the course of a permissible attempt to exercise her constitutional rights as Jane's parent. And, when one considers the record evidence concerning defendant's conduct after discovering Mr. Ditenhafer in

the very act of abusing Jane, the evidence that defendant precluded investigating officials from having access to Jane deceitfully and with an intent to defraud seems even more compelling. Thus, for all of these reasons, we have no hesitation in concluding that the Court of Appeals did not err by upholding defendant's conviction for felonious obstruction of justice based upon defendant's interference with investigating officials' access to Jane.

### III. Conclusion

A careful review of the evidence presented for the jury's consideration persuades us that the record, when viewed in the light most favorable to the State, contains substantial evidence tending to show that defendant had acted with deceit and an intent to defraud at the time that she obstructed justice by denying officers of the Wake County Sheriff's Office and Wake County Department of Human Services employees access to Jane during their investigation of Jane's allegations against Mr. Ditenhafer. As a result, the Court of Appeals' decision to find no error in the trial court's judgment based upon defendant's conviction for felonious obstruction of justice arising from the denial of access to Jane is affirmed.

AFFIRMED.